IN THE SUPREME COURT OF NORTH CAROLINA

No. 391PA15

Filed 21 December 2016

CITY OF ASHEVILLE, a municipal corporation

v.

STATE OF NORTH CAROLINA and the METROPOLITAN SEWERAGE DISTRICT OF BUNCOMBE COUNTY

On discretionary review pursuant to N.C.G.S. § 7A-31 and on appeal of right of a substantial constitutional question pursuant to N.C.G.S. § 7A-30(1) from a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 777 S.E.2d 92 (2015), affirming in part and reversing and remanding in part a summary judgment order entered on 9 June 2014, as clarified by means of a consent order entered on 3 July 2014, both by Judge Howard E. Manning, Jr. in Superior Court, Wake County. Heard in the Supreme Court on 17 May 2016 in session in the Old Burke County Courthouse in the City of Morganton pursuant to N.C.G.S. § 7A-10(a).

*Ellis & Winters LLP, by Matthew W. Sawchak, Paul M. Cox, and Emily E. Erixson; Campbell Shatley, PLLC, by Robert F. Orr; Long, Parker, Warren, Anderson & Payne, P.A., by Robert B. Long, Jr.; and City of Asheville City Attorney's Office, by Robin T. Currin, for plaintiff-appellant.*

*Roy Cooper, Attorney General, by I. Faison Hicks, Special Deputy Attorney General, for defendant-appellee State of North Carolina.*

*Cauley Pridgen, P.A., by James P. Cauley, III and Gabriel Du Sablon, for City of Wilson, amicus curiae.*

*Allegra Collins Law, by Allegra Collins, and Alexandra Davis, for International Municipal Lawyers Association, amicus curiae.*

*Kimberly S. Hibbard, General Counsel, and Gregory F. Schwitzgebel III, Associate General Counsel, for North Carolina League of Municipalities, amicus curiae.*

ERVIN, Justice.

In 2013, the General Assembly enacted legislation that effectively required the City of Asheville to involuntarily transfer the assets that it uses to operate a public water system to a newly created metropolitan water and sewerage district. *See* Act of May 2, 2013, ch. 50, 2013 N.C. Sess. Laws 118, amended by Act of July 22, 2013, ch. 388, secs. 4-5, 2013 N.C. Sess. Laws 1605, 1618. Following the enactment of this legislation, the City sought a declaratory judgment and injunctive relief in Superior Court, Wake County. The trial court concluded that this involuntary transfer violated various provisions of the North Carolina Constitution, declared the relevant statutory provisions to be void and unenforceable, and permanently enjoined the State from enforcing the legislation. On appeal, the Court of Appeals reversed the trial court's order, in part, and directed the trial court to enter summary judgment in favor of the State. *City of Asheville v. State*, ___ N.C. App. ___, ___, 777 S.E.2d 92, 102 (2015). In view of our determination that the legislation in question constitutes a prohibited "[l]ocal . . . act . . . [r]elating to health[ and] sanitation" in violation of Article II, Section 24(1)(a) of the North Carolina Constitution, we reverse the Court of Appeals' decision. N.C. Const. art. II, § 24(1)(a).

The City is a municipal corporation that is authorized, among other things, to own and acquire property. N.C.G.S. §§ 160A-1(2), -11 (2015). Pursuant to N.C.G.S. §§ 160A-311(2) and 160A-312, along with Chapter 399 of the 1933 Public-Local Laws, Chapter 140 of the 2005 Session Laws, and Chapter 139 of the 2005 Session Laws (the last three of which are referred to collectively as "the Sullivan Acts" and individually as "Sullivan I," "Sullivan II," and "Sullivan III," respectively, *see City of Asheville v. State*, 192 N.C. App. 1, 4-5, 665 S.E.2d 103, 109 (2008) (*Asheville I*), *appeal dismissed & disc. rev. denied*, 363 N.C. 123, 672 S.E.2d 685 (2009)), the City owns and operates a system for the supply, treatment, and distribution of water and for the operation of sanitary disposal systems serving individuals and entities both within and outside of its corporate limits.[1] *See* N.C.G.S. §§ 160A-311(2), -312 (2015); Act of Apr. 28, 1933 (Sullivan I), ch. 399, 1933 N.C. Pub.-Local Laws 376 (captioned "An Act to Regulate Charges Made by the City of Asheville for Water Consumed in Buncombe County Water Districts"); Act of June 29, 2005 (Sullivan III), ch. 139, 2005 N.C. Sess. Laws 243 (captioned "An Act Regarding the Operation of Public Enterprises by the City of Asheville"); Act of June 29, 2005 (Sullivan II), ch. 140, 2005 N.C. Sess. Laws 244 (captioned "An Act Regarding Water Rates in Buncombe

---

[1] As of June 2014, the City's water system consisted of a sizeable watershed; two impoundments; three water treatment plants; 29 treated water storage reservoirs; 1,661 miles of transmission and distribution lines; at least 40 pump stations; and certain intangible assets, including, but not limited to, approximately 147 trained and certified employees, numerous licenses, wholesale water supply contracts, contracts for the supply of goods and services, and revenue accounts containing more than $2,218,000.00 that are held for the purpose of ensuring repayment of outstanding bonded indebtedness.

County"). As of 29 August 2013, the City provided water service to approximately 124,000 customers, approximately 48,000 of whom received service outside the City's municipal limits. The City's water system has been built and maintained over the course of the past century using a combination of taxes, service fees, connection charges, bonded indebtedness, federal and state grants, contributions from Buncombe County, and donations from property owners and developers.[2]

Customers in Buncombe County served by the City's water system receive sewer service from the Metropolitan Sewerage District of Buncombe County,[3] a political subdivision that is authorized, among other things, to own, operate, and maintain a system for the treatment and disposal of sewerage in its assigned service area. *See* N.C.G.S. §§ 162A-65(8), -69 (2015). The Metropolitan Sewerage District has never provided water service to any customer.

In May 2013, House Bill 488, which is entitled "An Act to Promote the Provision of Regional Water and Sewer Services by Transferring Ownership and Operation of Certain Public Water and Sewer Systems to a Metropolitan Water and Sewerage District," became law. Ch. 50, 2013 N.C. Sess. Laws 118. According to Section 2 of the legislation, two or more political subdivisions are authorized to

---

[2] Although some of the assets of Asheville's water system were, at one time, owned by Buncombe County, the County conveyed its interest in those assets to the City on 15 May 2012.

[3] Although the Metropolitan Sewerage District has been joined as a party defendant in this case, it has not taken a position with respect to the merits of any of the claims asserted in the City's pleadings.

voluntarily establish a new type of entity, to be known as a "metropolitan water and sewerage district," which is "authorized and empowered" to "exercise any power of a Metropolitan Water District under G.S. 162A-36, except subdivision (9) of that section"; to "exercise any power of a Metropolitan Sewer District under G.S. 162A-69, except subdivision (9) of that section"; and "[t]o do all acts and things necessary or convenient to carry out the powers granted by" the newly created Article 5A. *Id.*, sec. 2, at 119-24. Pursuant to Section 1(a) of the legislation, "[a]ll assets, real and personal, tangible and intangible, and all outstanding debts of any public water system" meeting certain statutorily specified criteria "are by operation of law transferred to the metropolitan sewerage district operating in the county where the public water system is located" regardless of whether the municipality in question consents to the required transfer.[4] *Id.*, sec. 1(a), at 118-19. Finally, Section 5.5 of the legislation provides that no metropolitan sewerage district can be created in any county which currently lacks such an entity without the consent of all the affected political subdivisions in the proposed district, *id.*, sec. 5.5, at 125, a provision that has the effect of preventing any involuntary transfers of the type required by Section 1 in the future.

---

[4] The first six sentences of Chapter 50 of the 2013 North Carolina Session Laws are titled Sections 1(a) through 1(f). Chapter 388 of the 2013 Session Laws added Section 1(g). The parties regularly referred to these seven sections as simply "Section 1."

On 14 May 2013, the City filed a complaint and a motion seeking temporary, preliminary, and permanent injunctive relief in which the City alleged that the involuntary transfer provisions of the legislation, which were specifically designed to apply to the City and to no other municipality in North Carolina, constituted an invalid local act "[r]elating to health, sanitation, and the abatement of nuisances" prohibited by Article II, Section 24(1)(a) of the North Carolina Constitution and "[r]elating to non-navigable streams" prohibited by Article II, Section 24(1)(e) of the North Carolina Constitution; violated the City's due process and equal protection rights as guaranteed by Article I, Section 19 of the North Carolina Constitution; worked an unlawful taking of the City's property in violation of Article I, Sections 19 and 35 of the North Carolina Constitution; impaired the City's contracts with the holders of the bonds that had been issued to finance the construction of the City's water system in violation of Article I, Section 10 of the United States Constitution; impaired the City's obligations to its bondholders under N.C.G.S. § 159-93; and, in the alternative, took the City's property without just compensation in violation of Article I, Sections 19 and 35 of the North Carolina Constitution. Based upon these claims, the City sought a declaration that Section 1 of the legislation is unconstitutional; asked that the enforcement of Section 1 of the legislation be temporarily restrained and preliminarily and permanently enjoined; and requested that, in the alternative, the City be awarded monetary damages sufficient to indemnify the City from any loss that might result from the enactment of the

legislation. On 14 May 2013, Judge Donald W. Stephens entered a temporary restraining order precluding the implementation or enforcement of Section 1 of the legislation.[5]

On 23 August 2013, the Governor signed Chapter 388 of the 2013 Session Laws, which had been enacted by the General Assembly on 22 July 2013 and which amended Section 1 of the Act in two ways. Ch. 388, secs. 4-5, 2013 N.C. Sess. Laws at 1618. More specifically, the newly enacted legislation repealed Section 1(a)(2) of Chapter 50 of the 2013 Session Laws so as to effectively eliminate one of the original criteria necessary to trigger an involuntary transfer of a covered municipality's water system, *id.*, sec. 4, at 1618 (stating that "Section 1(a)(2) of S.L. 2013-50 is repealed"), and added a new exemption from the existing involuntary transfer requirement, *id.*, sec. 5, at 1618 (amending "S.L. 2013-50 . . . by adding a new section" 1.(g)). As a result, the trial court entered a consent order providing, among other things, that the parties would be allowed to amend their pleadings to reflect these modifications to the legislation.

On 2 October 2013, the City filed an amended complaint in which it asserted the same substantive claims that had been raised in its initial pleading.[6] On 7 November 2013, the State filed a responsive pleading in which it alleged, among other

---

[5] The enforcement of Section 1 of the legislation has been enjoined throughout the course of this litigation.

[6] The City predicated its amended impairment of contract claim upon both Article I, Section 10 of the United States Constitution and Article I, Section 19 of the North Carolina Constitution.

things, that the City lacked the capacity and standing to bring its claims against the State and denied the material allegations of the City's complaint. On 27 February 2014, the State and the City filed motions seeking summary judgment in their favor. On 9 June 2014, the trial court entered an order finding that there were no genuine issues of material fact and determining that the legislation (1) "was specifically drafted and amended to apply only to Asheville and the Asheville Water System," making it "a local act which relates to health and sanitation in violation of Article II, Section 24(1)(a) of the North Carolina Constitution" and "a local act relating to non-navigable streams . . . in violation of Article II, Section 24(1)(e) of the North Carolina Constitution"; (2) "is contrary to the law of the land in violation of Article I, Section 19 of the North Carolina Constitution as the means utilized to achieve what the legislation sought to obtain bears no relation, rational basis or otherwise, to the Act's stated purpose"; and (3) "is not a valid exercise of the sovereign power of the legislative branch of government (or the State of North Carolina) to take or condemn property for a public use" in violation of Article I, Sections 19 and 35 of the North Carolina Constitution. In the alternative, the trial court further determined that, in the event that the General Assembly had the authority to order the involuntary transfer of the City's water system, "Asheville, as the owner of the Asheville Water System, is entitled to be paid just compensation." In light of these determinations, the trial court permanently enjoined enforcement of the legislation. As a result of its decision to grant the relief that had been requested by the City on other grounds, the

trial court "decline[d] to address" the claims that the City asserted pursuant to the state and federal contract clauses.[7] On 3 July 2014, the trial court entered a consent order indicating that it had declined to rule on the claims that the City had asserted pursuant to the contract clauses and N.C.G.S. § 159-93 on the grounds that they had "been rendered moot by the Court's ruling on the other claims." The State noted an appeal to the Court of Appeals from the trial court's orders.

Before the Court of Appeals, the State argued that the trial court had erred by concluding (1) that the City had the capacity and standing to bring its claims against the State; (2) that the Act is a "local[ ] . . . act" "[r]elating to health[ and] sanitation," N.C. Const. art. II, § 24(1)(a), and "non-navigable streams," *id.* art. II, § 24(1)(e); (3) that Section 1 of the legislation violated the City's state equal protection and substantive due process rights; and (4) that Section 1 of the legislation effected an unlawful taking of the City's property and, alternatively, that the City would be entitled to just compensation in the event that the involuntary transfer of its water system was lawful. In response, the City asserted (1) that it "unquestionably has standing to challenge the constitutionality" of the Act; (2) that Section 1 of the legislation is an unconstitutional "local act" "relating to health and sanitation" in violation of Article II, Section 24(1)(a) and "relating to non-navigable streams" in violation of Article II, Section 24(1)(e); (3) that, although the Court of Appeals "need

---

[7] Although the trial court did not directly reference the City's claim pursuant to N.C.G.S. § 159-93, it did not address this claim either.

not reach the[se] issue[s,]" the legislation "violates both the takings element . . . and the due process and equal protection elements of" Article I, Section 19 of the North Carolina Constitution; and (4) that, if the Court of Appeals were to reverse the trial court, the City's bond-related claims "would remain for consideration" before the trial court.

After determining that the City had standing to challenge the constitutionality of the legislation "because it ha[d] not accepted any benefit from" the Act, *City of Asheville*, ___ N.C. App. at ___, 777 S.E.2d at 95 (citing *Town of Spruce Pine v. Avery County*, 346 N.C. 787, 790, 488 S.E.2d 144, 146 (1997)),[8] the Court of Appeals held that the trial court had erred by invalidating the legislation, *id.* at ___, 777 S.E.2d at 102. After assuming for purposes of argument that the legislation "constitute[d] a 'local law,' " the court held that "it is not *plain and clear* and *beyond reasonable doubt*" that Section 1 "falls within the ambit of" Article II, Section 24(1)(a) or Article II, Section 24(1)(e) of the North Carolina Constitution. *Id.* at ___, 777 S.E.2d at 97. Instead, the legislation "appear[s] to prioritize concerns regarding the governance over water and sewer systems and the quality of the services rendered." *Id.* at ___, 777 S.E.2d at 98 (citing ch. 50, sec. 2, 2013 N.C. Sess. Laws at 119-24 (codified at Article 5A in N.C.G.S. Chapter 162A)).[9] In addition, the Court of Appeals concluded

---

[8] The State has not sought review of the Court of Appeals' decision with respect to the standing issue.

[9] On the basis of a similar analysis, the Court of Appeals concluded that "[t]here is nothing in the . . . Act which suggests that its purpose is to address some concern regarding

that the legislation did not violate the City's right to equal protection under the state constitution, *id.* at \_\_\_, 777 S.E.2d at 99-101, effectuate a taking of Asheville's water system for an invalid purpose, *id.* at \_\_\_, 777 S.E.2d at 101, or result in a valid taking for which the City was entitled to just compensation, *id.* at \_\_\_, 777 S.E.2d at 101-02.[10]  Finally, with respect to the claims that the City had asserted pursuant to the contract clauses and N.C.G.S. § 159-93, the Court of Appeals stated that, because the City had not argued that those claims constituted "an alternative basis in law for supporting" the relief sought, it had waived the right to assert those claims in the future.  *Id.* at \_\_\_, 777 S.E.2d at 95 n.2 (quoting N.C. R. App. P. 10(c)); *id.* at \_\_\_, 777 S.E.2d at 102-03.  As a result, the Court of Appeals reversed, in part, the trial court's order and remanded the case to the trial court for the entry of summary judgment in the State's favor.  *Id.* at \_\_\_, 777 S.E.2d at 102.  After the City unsuccessfully sought rehearing of the Court of Appeals' decision with respect to, among other things, the claims that the City had asserted in reliance upon the contract clauses and N.C.G.S. § 159-93, this Court retained jurisdiction over the City's notice of appeal and allowed the City's petition for discretionary review.

In seeking relief from this Court, the City argues that the Court of Appeals erred (1) by concluding that Section 1 of the legislation is not an unconstitutional

---

a non-navigable stream." *Id.* at \_\_\_, 777 S.E.2d at 98.  The City has not requested review of this aspect of the Court of Appeals' decision.

[10] The City has not sought review by this Court of the Court of Appeals' decision to reject its due process and equal protection claims.

local act relating to health and sanitation prohibited by Article II, Section 24(1)(a) of

the North Carolina Constitution; (2) in holding that Section 1 of the legislation does

not effectuate a taking for which Asheville is entitled to compensation pursuant to

Article I, Section 19 of the North Carolina Constitution; and (3) by appearing to hold

that the City had abandoned any right to assert its claims pursuant to the contract

clauses and N.C.G.S. § 159-93 on remand by failing to raise them on appeal pursuant

to Rule 10(c) of the North Carolina Rules of Appellate Procedure. For the reasons set

forth below, the Court of Appeals' decision is reversed.[11]

> It is well settled in this State that the courts have
> the power, and it is their duty in proper cases, to declare
> an act of the General Assembly unconstitutional—but it
> must be plainly and clearly the case. If there is any
> reasonable doubt, it will be resolved in favor of the lawful
> exercise of their powers by the representatives of the
> people.

*Glenn v. Bd. of Educ.*, 210 N.C. 525, 529-30, 187 S.E. 781, 784 (1936). In determining

"the constitutionality of a legislative act it is not for this Court to judge its wisdom

and expediency. These matters are the province of the General Assembly." *Adams*

---

[11] Although we need not reach the issue of whether the Court of Appeals erred by apparently holding that the City had waived the right to have the claims that it had asserted pursuant to the contract clauses and N.C.G.S. § 159-93 considered on remand by failing to assert those claims as an alternative basis for upholding the trial court's order pursuant to Rule 10(c) of the North Carolina Rules of Appellate Procedure, we disavow that holding in order to avoid confusion in subsequent cases. Simply put, nothing in the relevant provisions of the North Carolina Rules of Appellate Procedure or any of our prior cases requires an appellee to challenge legal decisions that the trial court declined to make on the grounds that the case could be fully resolved on some other basis on appeal pursuant to Rule 10(c) of the North Carolina Rules of Appellate Procedure at the risk of losing the right to assert those claims at a later time.

*v. N.C. Dep't of Nat. & Econ. Res.*, 295 N.C. 683, 690, 249 S.E.2d 402, 406 (1978). On the other hand, " '[i]f there is a conflict between a statute and the Constitution, this Court must determine the rights and liabilities or duties of the litigants before it in accordance with the Constitution, because the Constitution is the superior rule of law in that situation.' " *Id.* at 690, 249 S.E.2d at 406 (quoting *Nicholson v. State Educ. Assistance Auth.*, 275 N.C. 439, 447, 168 S.E.2d 401, 406 (1969) (citation omitted)).

Article II, Section 24 of the North Carolina Constitution, which expressly forbids the General Assembly from "enact[ing] any local, private, or special act or resolution" concerning fourteen "[p]rohibited subjects," N.C. Const. art. II, § 24(1), "is the fundamental law of the State and may not be ignored," *High Point Surplus Co. v. Pleasants*, 264 N.C. 650, 656, 142 S.E.2d 697, 702 (1965). More specifically, Article II, Section 24 of the North Carolina Constitution provides that:

> (1) Prohibited subjects. – The General Assembly shall not enact any local, private, or special act or resolution:
>
> (a) Relating to health, sanitation, and the abatement of nuisances;
>
> . . . .
>
> (3) Prohibited acts void. – Any local, private, or special act or resolution enacted in violation of the provisions of this Section shall be void.

N.C. Const. art. II, § 24(1)(a), (3). Although the General Assembly shall not "enact any local, private, or special act" regarding any of the fourteen prohibited subjects

listed in Article II, Section 24(1) "by the partial repeal of a general law," *id.* art. II, §

24(2), it "may . . . repeal local, private, or special laws enacted by it," *id.*, and "enact

general laws regulating the matters set out" in the relevant constitutional provision,

*id.* art. II, § 24(4).

As the history of Article II, Section 24 of the North Carolina Constitution[12]

demonstrates:

> The organic law of the State was originally drafted and promulgated by a convention which met at Halifax in December, 1776. During the ensuing 140 years, the Legislature of North Carolina possessed virtually unlimited constitutional power to enact local, private, and special statutes. This legislative power was exercised with much liberality, and produced a plethora of local, private, and special enactments. As an inevitable consequence, the law of the State was frequently one thing in one locality, and quite different things in other localities. To minimize the resultant confusion, the people of North Carolina amended their Constitution at the general election of 1916 so as to deprive their Legislature of the power to enact local, private, or special acts or resolutions relating to many of the most common subjects of legislation.
>
> . . . .
>
> In thus amending their organic law, the people were motivated by the desire that the General Assembly should legislate for North Carolina in respect to the subjects specified as a single united commonwealth rather than as a conglomeration of innumerable discordant communities. To prevent this laudable desire from degenerating into a mere pious hope, they decreed in emphatic and express terms that "any local, private, or special act or resolution

---

[12] At the time of its original adoption, the language now contained in Article II, Section 24 appeared in Article II, Section 29.

passed in violation of the provisions of this section shall be void [. . . .]"

*Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 185-86, 581 S.E.2d 415, 426-27 (2003) (quoting *Idol v. Street*, 233 N.C. 730, 732-33, 65 S.E.2d 313, 314-15 (1951) (first alteration in original) (quoting N.C. Const. of 1868, art. II, § 29 (1917) (now art. II, § 24(3)))).

> It was the purpose of the amendment to free the General Assembly from the enormous amount of petty detail which had been occupying its attention, to enable it to devote more time and attention to general legislation of statewide interest and concern, to strengthen local self-government by providing for the delegation of local matters by *general laws* to local authorities, and to require uniform and coordinated action under general laws on matters related to the welfare of the whole State.

*High Point Surplus Co.*, 264 N.C. at 656, 142 S.E.2d at 702. We are called upon to evaluate the constitutionality of Section 1 of the legislation against this historical backdrop.

"The first issue [that must be resolved in this case] is whether the Act is a *local act* prohibited by Article II, section 24 of the Constitution or is a *general law* which the General Assembly has the power to enact." *Adams*, 295 N.C. at 690, 249 S.E.2d at 406. "A statute is either 'general' or 'local'; there is no middle ground." *High Point Surplus Co.*, 264 N.C. at 656, 142 S.E.2d at 702. "[N]o exact rule or formula capable of constant application can be devised for determining in every case whether a law is local, private or special or whether [it is] general." *McIntyre v. Clarkson*, 254 N.C.

510, 517, 119 S.E.2d 888, 893 (1961). The primary test that this Court has employed for the purpose of differentiating between general and local acts for the past half-century has been the "reasonable classification" test adopted in *McIntyre, id.* at 517-19, 525-26, 119 S.E.2d at 893-95, 898-99. *See, e.g., Williams*, 357 N.C. at 183-85, 581 S.E.2d at 425-26; *City of New Bern v. New Bern–Craven Cty. Bd. of Educ.*, 338 N.C. 430, 435-37, 450 S.E.2d 735, 738-39 (1994)*; Adams*, 295 N.C. at 690-91, 249 S.E.2d at 406-07; *Treasure City of Fayetteville, Inc. v. Clark*, 261 N.C. 130, 133, 134 S.E.2d 97, 99 (1964). In applying this test, we must remember that "the number of counties included or excluded [from the ambit of an act] is not necessarily determinative." *High Point Surplus Co.*, 264 N.C. at 656, 142 S.E.2d at 702.

> Conceivably, a statute may be local if it excludes only one county. On the other hand, it may be general if it includes only one or a few counties. It is a matter of classification. For the purposes of legislating, the General Assembly may and does classify conditions, persons, places and things, and classification does not render a statute "local" if the classification is reasonable and based on rational difference of situation or condition; "[u]niversality is immaterial so long as those affected are reasonably different from those excluded and for the purpose of the [act] there is a logical basis for treating them in a different manner." A law is local "where, by force of an inherent limitation, it arbitrarily separates some places from others upon which, but for such limitation, it would operate, [ ] where it embraces less than the entire class of places to which such legislation would be necessary or appropriate having regard to the purpose for which the legislation was designed, and where [the] classification does not rest on circumstances distinguishing the places included from those excluded."

*Id.* at 656-57, 142 S.E.2d at 702 (first alteration in original) (quoting *McIntyre*, 254 N.C. at 518, 119 S.E.2d at 894) (citations omitted)). Put another way, a local law "discriminates between different localities without any real, proper, or reasonable basis or necessity—a necessity springing from manifest peculiarities clearly distinguishing those of one class from each of the other classes, and imperatively demanding legislation for each class separately that would be useless or detrimental to the others." *McIntyre*, 254 N.C. at 518, 119 S.E.2d at 894 (quoting 50 Am. Jur. *Statutes* § 8, at 25 (1944) (footnotes omitted)).

> On the other hand, a law is general " 'if it applies to and operates uniformly on all the members of any class of persons, places or things requiring legislation peculiar to itself in matters covered by the law.' [ ] Classification must be reasonable and germane to the law. It must be based on a reasonable and tangible distinction and operate the same on all parts of the [S]tate under the same conditions and circumstances. Classification must not be discriminatory, arbitrary or capricious."

*High Point Surplus Co.*, 264 N.C. at 657, 142 S.E.2d at 702-03 (quoting *McIntyre*, 254 N.C. at 519, 119 S.E.2d at 894) (citation omitted)). As noted by a leading scholar cited with regularity by this Court, *e.g., Adams*, 295 N.C. at 690-91, 249 S.E.2d at 407:

> In barest outline, a statutory classification is held to be "reasonable" if it satisfies the following five tests: (1) the classification must be based upon substantial distinctions which make one class really different from another; (2) the classification adopted must be germane to the purpose of the law; (3) the classification must not be based upon existing circumstances only; (4) to whatever class a law may apply, it must apply equally to each member thereof;

and (5) if the classification meets these requirements, the
number of members in a class is wholly immaterial.

Joseph S. Ferrell, *Local Legislation in the North Carolina General Assembly*, 45 N.C.

L. Rev. 340, 391-92 (1967) [hereinafter Ferrell, *Local Legislation*] (footnotes omitted).

The reasonable classification test utilized to distinguish between general and local

legislation is not equivalent to the rational basis test utilized in due process and equal

protection cases. *See id.* at 391-92 (footnotes omitted).

In *Town of Emerald Isle v. State*, 320 N.C. 640, 360 S.E.2d 756 (1987), this

Court articulated a different test for determining whether an act is general or local

that focused on "the extent to which the act in question affects the general public

interests and concerns," *id.* at 651, 360 S.E.2d at 763 (applying this test to legislation

that provided for a specific public pedestrian beach access point and related facilities

at Bogue Inlet in Carteret County), which we have not utilized in any subsequent

case. We "departed from the reasonable classification method of analysis" in *Town of

Emerald Isle* because it was " 'ill-suited to the question presented [there], since by

definition a particular public pedestrian beach access facility must rest in but one

location.' " *City of New Bern*, 338 N.C. at 436, 450 S.E.2d at 739 (quoting *Town of

Emerald Isle*, 320 N.C. at 650, 360 S.E.2d at 762). The City contends that the

legislation is a local law under either test while the State advances the opposite

contention. We find the City's argument persuasive.

The legislation states that:

> Whereas, regional water and sewer systems provide reliable, cost-effective, high-quality water and sewer services to a wide range of residential and institutional customers; and
>
> Whereas, in an effort to ensure that the citizens and businesses of North Carolina are provided with the highest quality services, the State recognizes the value of regional solutions for public water and sewer for large public systems; Now, therefore,

Ch. 50, pmbl., 2013 N.C. Sess. Laws at 118. Simply put, the General Assembly stated that large, public regional water and sewer systems will better ensure that North Carolina citizens have access to higher quality, cost-effective water and sewer services and that the creation of regional water and sewer systems should be encouraged for that reason. In view of the fact that the stated purpose of the legislation contains no indication that it was site-specific in nature, we conclude that the reasonable classification test should be utilized in determining whether the legislation is local or general in nature. *See, e.g.*, *Williams*, 357 N.C. at 184-85, 581 S.E.2d at 426 (applying the "reasonable classification" test on the grounds that, while "the enabling legislation and the Ordinance allowing for the creation of a comprehensive civil rights ordinance apply only to Orange County, this legislation is not site-specific as in *Emerald Isle* because '[s]uch a legislated change could be effected as easily in [Orange County] as in any other [county] in the state' " (alterations in original) (quoting *City of New Bern*, 338 N.C. at 436, 450 S.E.2d at 739)).

According to Section 1 of the legislation, as amended, the involuntary transfer of a municipal water system to a metropolitan water and sewerage system is required if, and only if, (1) "[t]he public water system is owned and operated by a municipality located in a county where a metropolitan sewerage district is operating" and (2) "[t]he public water system serves a population of greater than 120,000 people." Ch. 50, sec. 1(a), 2013 N.C. Sess. Laws at 118-19, as amended by Ch. 388, sec. 4, 2013 N.C. Sess. Laws at 1618. In other words, the involuntary transfer provisions of Section 1 do not apply to any municipality that operates a water system unless that municipality serves more than 120,000 customers and is located in a county in which a metropolitan sewerage district provides sewer service pursuant to Article 5 of Chapter 162A of the North Carolina General Statutes, N.C.G.S. §§ 162A-64 to -81 (2015). Although the legislation appears to create a class of municipalities to which the involuntary transfer provisions of Section 1 apply, an examination of the criteria delineating the composition of that class demonstrates that the involuntary transfer provision has been crafted in such a manner that it does not and will not apply to any municipality other than the City.

According to the undisputed record evidence, there are only three metropolitan sewerage districts presently operating in North Carolina: the Metropolitan Sewerage District of Buncombe County, the Contentnea Metropolitan Sewerage District in Pitt County, and the Bay River Metropolitan Sewerage District in Pamlico County. The only municipal water system located in a county served by one of these three

metropolitan sewerage districts that has over 120,000 customers is that owned and operated by the City. Although existing population growth trends create some possibility that the water system operated by the City of Greenville could reach the 120,000 person threshold in the foreseeable future,[13] the General Assembly took affirmative action to eliminate any risk that Greenville would ever have to involuntarily transfer its water system to the Contentnea Metropolitan Sewerage District.

As originally enacted, the legislation contained a third criterion that had to be met before an involuntary transfer was required, which was that "[t]he public water system has not been issued a certificate for an interbasin transfer." Ch. 50, sec. 1(a)(2), 2013 N.C. Sess. Laws at 119. In view of the fact that Greenville possessed an interbasin transfer certificate, it was exempt from the involuntary transfer requirement contained in the original version of the legislation. Although the enactment of Chapter 388, Section 4 of the 2013 Session Laws eliminated the interbasin transfer certificate exception from the involuntary transfer provision of the legislation, Section 5 of Chapter 388 of the 2013 Session Laws added Section 1(g), which provides that, "[f]or purposes of this section, a public water system shall not include any system that is operated simultaneously with a sewer system by the same

---

[13] The record clearly establishes that none of the municipal water systems located in the territory in which the Bay River Metropolitan Sewerage District operates have any prospect of serving the requisite number of customers in the foreseeable future.

public body, in conjunction with the provision of other utility services for its customers," to the legislation. Ch. 388, sec. 5, 2013 N.C. Sess. Laws at 1618. In view of the fact that Greenville provides both sewer and water service to its customers in conjunction with a system for the supply of electricity and natural gas, the enactment of Section 1(g) had the effect of preserving Greenville's exception from the involuntary transfer requirement.

In addition, we note that Section 5.5 of the legislation prohibits the creation of any new metropolitan sewerage districts without the consent of all relevant local governmental entities. Ch. 50, sec. 5.5, 2013 N.C. Sess. Laws at 125. The inclusion of Section 5.5 ensured that all of the other municipalities that currently operate water systems that serve more than 120,000 customers, such as Charlotte, Durham, Fayetteville, Greensboro, and Winston-Salem, or will operate such systems in the future will never be subjected to the involuntary transfer provisions of the legislation. Thus, the undisputed record evidence clearly shows that the City is the only entity that will ever be required to involuntarily transfer its water system to a metropolitan sewerage district under the legislation.

Although the fact that the City is the only municipality that will ever be subject to the involuntary transfer provisions of the legislation does not, standing alone, mean that the legislation is, per se, a "local" act, *see High Point Surplus Co.*, 264 N.C. at 656, 142 S.E.2d at 702 (stating that a statute "may be general if it includes only one or a few counties"), it does, however, indicate the existence of a serious question

concerning the extent to which the classification contained in the legislation is "reasonable and germane to the law" and "based on a reasonable and tangible distinction," *id.* at 657, 142 S.E.2d at 702 (quoting *McIntyre*, 254 N.C. at 519, 119 S.E.2d 894 (citation omitted)). Nothing in the legislation in any way explains why every other municipality in North Carolina except the City should have the right to decide for itself whether to transfer its water system to a metropolitan water and sewerage district. Moreover, nothing in the legislation does anything to explain why the benefits that the General Assembly expects to result from the creation of metropolitan water and sewerage districts should not be made available to the customers of every large municipal water system in North Carolina. The total absence of any justification for singling out the City's water system from other large municipally owned systems and the steps taken during the drafting process to ensure that the involuntary transfer provisions of the legislation did not apply to any municipality except the City demonstrate that the involuntary transfer provisions were never intended to apply to any municipal water system except that owned by the City. As a result, given the absence of any reasonable relationship between the stated justification underlying the legislation and the classification adopted by the General Assembly for the purpose of achieving its stated goal, the legislation is, without doubt, a local rather than a general law. *See, e.g., Treasure City of Fayetteville*, 261 N.C. at 133-36, 134 S.E.2d at 99-101 (holding that a statute prohibiting sales of certain goods on Sunday that did not apply to all or portions of

twenty-nine counties for the stated reason that the excluded territories were resort or tourist areas was a local, rather than a general, act given that the legislation did not apply to all of North Carolina's resort and tourist areas and given that some of the goods and services whose sale was prohibited by the legislation were of primary interest to permanent residents rather than tourists); *see also* Ferrell, *Local Legislation* 394 (noting the Court's holding that the statutory provision at issue in *Treasure City* was a local act given that the classification embodied in the challenged legislation was "a sham").

In spite of the absence of "any real, proper, or reasonable basis or . . . necessity springing from manifest peculiarities clearly distinguishing . . . and imperatively demanding" the involuntary transfer of the City's water system to a metropolitan water and sewerage district in the face of an apparent determination that similar treatment would be "useless or detrimental to [every] other[ ]" North Carolina municipality, *McIntyre*, 254 N.C. at 518, 119 S.E.2d at 894 (quoting 50 Am. Jur. *Statutes* § 8, at 25 (1944) (footnotes omitted)), the State hypothesizes that the General Assembly's decision to treat the City differently than all other North Carolina municipalities might hinge upon the "unique facts" and history of the "Asheville-Buncombe-Henderson region," which the State claims to consist of a "prolonged history of conflict between" the City and residents of Buncombe and Henderson Counties who are dependent on the City's water system that has been "characterized by charges of discrimination and the misuse of public monies and other resources"

and has "engendered a toxically high level of public distrust and cynicism concerning local government in that region which itself makes sound democratic governance there difficult to achieve." More specifically, the State asserts, as a purely hypothetical matter, that the General Assembly "could have" singled out the City's water system for involuntary transfer due to "fundamental and serious governance problems" that affect extraterritorial customers located in portions of Buncombe County outside the City's municipal limits and in Henderson County. In addition, the State hypothesizes that, given the area's status as a tourist destination, the General Assembly "could reasonably have concluded" that an involuntary transfer of the City's water system would prevent the "atmosphere of conflict in this region" from "tarnish[ing] . . . this region in the eyes of the public generally" and "threaten[ing], among other things, the vitality of a local tourist industry which is enormous and is of tremendous importance to all the citizens of this State." We do not find this argument persuasive.

At the outset, we note that this aspect of the State's defense of the legislation seems rooted in the rational basis test employed in the due process and equal protection context. *See, e.g., In re R.L.C.*, 361 N.C. 287, 295, 643 S.E.2d 920, 924 (noting that, in the context of an as-applied due process challenge, evaluating "whether the law in question is rationally related to a legitimate government purpose" does not require "courts to determine the actual goal or purpose of the government action at issue" and allows the reviewing court to uphold the legislation

on the basis of "any conceivable legitimate purpose" (citations omitted)), *cert. denied*, 552 U.S. 1024, 128 S. Ct. 615, 169 L. Ed. 2d 396 (2007). However, nothing in our Article II, Section 24 jurisprudence suggests that we should focus on a hypothetical, rather than the actual, justification for the challenged legislation in determining whether it should be deemed general or local in nature. Furthermore, a decision to approve the use of the hypothetical purpose approach suggested by the State would deprive Article II, Section 24 of the North Carolina Constitution of any meaningful effect by rendering it indistinguishable from the substantive due process provisions of Article I, Section 19 of the North Carolina Constitution. *Cf. District of Columbia v. Heller*, 554 U.S. 570, 628 n.27, 171 L. Ed. 2d 637, 679 n.27, 128 S. Ct. 2783, 2818 n.27 (2008) (rejecting such a result under the federal constitution and, more specifically, stating that, "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect"). As a result, we will focus our analysis upon the extent, if any, to which there is record support for the State's argument to the effect that the legislation is a general, rather than a local, act.

Although the State has directed the Court's attention to "[t]he documented historical record" reflected in this Court's decision in *Candler v. City of Asheville*, 247 N.C. 398, 101 S.E.2d 470 (1958), and the Court of Appeals' 2008 decision in *City of Asheville*, these materials provide no support for the State's argument that the

legislation is a general, rather than a local, law. Instead, we explicitly stated in *Candler* that "[t]here is nothing on this record which tends to show that the rate or rates to be charged" to extraterritorial customers "are unjust and confiscatory." *Id.* at 410, 101 S.E.2d at 479. Although the Court of Appeals did note the existence of "ample support in the record to justify the Legislature's findings that Asheville and Buncombe County have experienced a 'complicated pattern of dealings' with respect to the development and maintenance of its water distribution system" in *Asheville I*, 192 N.C. App. at 31-32, 665 S.E.2d at 125 (quoting Sullivan II, ch. 140, 2005 N.C. Sess. Laws at 246), the court also stated that (1) it was "not clear from the record that this history is one of 'manifest peculiarities clearly distinguishing' Asheville and Buncombe County from other municipalities and counties across the State," *id.* at 32, 665 S.E.2d at 125 (quoting *McIntyre*, 254 N.C. at 518, 119 S.E.2d at 894); (2) it was "not persuaded that the history of the development of the [Asheville] water distribution system" justified a decision to treat the City as unique for legislative classification purposes, *id.* at 32, 665 S.E.2d at 126; and (3) the statutory provisions at issue in *Asheville I* appeared to "embrace[ ] less than the entire class of places to which such legislation would be necessary or appropriate having regard to the purpose for which the legislation was designed," *id.* at 32, 665 S.E.2d at 126 (alteration in original) (quoting *Williams*, 357 N.C. at 184, 581 S.E.2d at 426 (quoting *McIntyre*, 254 N.C. at 518, 119 S.E.2d at 894)). Based upon these determinations, the court in *Asheville I* held that the challenged statutory provisions were "local acts."

*Id.* at 32, 665 S.E.2d at 126. Moreover, the State conceded during oral argument that the present record contains no support for any assertion that the City continued to engage in abusive or discriminatory behavior after 2008. Finally, even if the legislation is intended to ensure the availability of better water service at a lower cost in Buncombe County by fostering the creation of a large, regional water and sewer system, the classification upon which the legislation relies "embraces less than the entire class of places to which such legislation would be necessary or appropriate having regard to the purpose for which the legislation was designed," *Williams*, 357 N.C. at 184, 581 S.E.2d at 426 (quoting *McIntyre*, 254 N.C. at 518, 119 S.E.2d at 894), given that none of the other public water systems owned and operated by Buncombe County municipalities receiving service from the Metropolitan Sewerage District, including Biltmore Forest, Black Mountain, Montreat, Weaverville, and Woodfin, are subject to the statute's involuntary transfer provision despite the fact that several of those municipalities charge higher rates to extraterritorial customers than to municipal residents and given that the Town of Hendersonville, which is located in Henderson County, owns and operates a municipal water system that charges higher rates to extraterritorial customers than to municipal residents as well. Thus, for all these reasons, the State's effort to establish that the legislation is a general, rather than a local, act necessarily fails.

Having determined that Section 1 of the Act is a local law, we must next consider whether the legislation "[r]elat[es] to health[ and] sanitation." N.C. Const.

art. II, § 24(1)(a). In answering this question in the negative, the Court of Appeals began by noting that, in the 2008 *City of Asheville* case, it had concluded that "the mere implication of water or a water system in a legislative enactment does not necessitate a conclusion that it relates to health and sanitation in violation of the Constitution," *id.* at ___, 777 S.E.2d at 97 (quoting *Asheville I*, 192 N.C. App. at 37, 665 S.E.2d at 129); that this Court's precedent "instructs" that a local law does not relate to health or sanitation "*unless* (1) the law plainly 'state[s] that *its purpose is to regulate* [this prohibited subject],' *or* (2) the reviewing court is able to determine 'that the purpose of the act is to regulate [this prohibited subject after] careful perusal of the entire act,' " *id.* at ___, 777 S.E.2d at 97-98 (second and third alterations in original) (quoting *Asheville I*, 192 N.C. App. at 33, 665 S.E.2d at 126 (first alteration in original) (citing and quoting *Reed v. Howerton Eng'g Co.*, 188 N.C. 39, 44, 123 S.E. 479, 481 (1924))); and "that the best indications of the General Assembly's purpose are 'the language of the statute, the spirit of the act, and what the act seeks to accomplish,' " *id.* at ___, 777 S.E.2d at 98 (quoting *Asheville I*, 192 N.C. App. at 37, 665 S.E.2d at 129 (quoting *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, 300 N.C. 381, 399, 269 S.E.2d 547, 561 (1980))). As a result, the Court of Appeals "first look[ed] to see if the . . . Act expressly states that its purpose is to regulate health or sanitation" and answered that question in the negative on the theory that the Act's "*stated* purpose," as reflected in its preamble, "is to address concerns regarding the quality of the service provided to the customers of public water and sewer systems."

*Id.* at \_\_\_, 777 S.E.2d at 98. Secondly, the Court of Appeals "peruse[d] the entire . . . Act to determine whether it is plain and clear that the Act's purpose is to regulate health or sanitation" and determined that "there are no provisions in the Act which 'contemplate[ ] . . . prioritizing the [Asheville Water System's] health or sanitary condition[.]' " *Id.* at \_\_\_, 777 S.E.2d at 98 (alterations in original) (quoting *Asheville I*, 192 N.C. App. at 36-37, 665 S.E.2d at 128). On the contrary, the fact that Section 2 of the legislation "allows for the 'denial or discontinuance of [water and sewer] service,' by [a metropolitan water and sewerage district] based on a customer's non-payment," *id.* at \_\_\_, 777 S.E.2d at 98 (first alteration in original) (quoting Ch. 50, sec. 2, 2013 N.C. Sess. Laws at 122 (codified at N.C.G.S. § 162A-85.13(c))), "belies Asheville's argument that the purpose of the Act relates to health and sanitation," *id.* at \_\_\_, 777 S.E.2d at 98 (citing *Asheville I*, 192 N.C. App. at 35, 665 S.E.2d at 127). As a result, the Court of Appeals concluded that the legislation "appear[s] to prioritize concerns regarding the governance over water and sewer systems and the quality of the services rendered," *id.* at \_\_\_, 777 S.E.2d at 98 (citing Ch. 50, sec. 2, 2013 N.C. Sess. Laws at 119-24), rather than health and sanitation.

In making this determination, the Court of Appeals distinguished several cases upon which the City relied before finding this Court's decision in *Reed v. Howerton Engineering Co.* controlling with respect to the health and sanitation issue. *Id.* at \_\_\_, 777 S.E.2d at 98-99. After noting that our decision in *Drysdale v. Prudden*, 195 N.C. 722, 143 S.E. 530 (1928), was "[t]he most compelling of" the cases cited in

support of the City's position, the Court of Appeals stated that this Court "base[d] its ruling [in *Drysdale*] on the fact that the act [was] a local law" and did not make "any determination regarding which of the 14 'prohibited subjects' was implicated by the act" at issue in that case, *City of Asheville*, ___ N.C. App. at ___, 777 S.E.2d at 98. In addition, the Court of Appeals distinguished *City of New Bern*, 338 N.C. at 437-38, 450 S.E.2d at 739-40, *Idol*, 233 N.C. at 733, 65 S.E.2d at 315, and *Sams v. Board of County Commissioners*, 217 N.C. 284, 285, 7 S.E.2d 540, 541 (1940), on the grounds that they "deal[t] with legislation that empowers a political subdivision with authority *to enforce health regulations* in a county" while the legislation at issue in this case "does not empower anyone to enforce health regulations" or "impose any health regulations on the Asheville Water System," *City of Asheville*, ___ N.C. App. at ___, 777 S.E.2d at 99. Moreover, the Court of Appeals pointed to our decision in *Reed*, which rejected a challenge to legislation that "created sewer districts in Buncombe County," "because the language in the act did not suggest [that health or sanitation was] the act's purpose" and because the challenged act "merely sought to create political subdivisions through which sanitary sewer service could be provided." *Id.* at ___, 777 S.E.2d at 98-99 (citing *Reed*, 188 N.C. at 42-45, 123 S.E. at 479-82). Finally, the Court of Appeals concluded that our decision in *Lamb v. Board of Education*, 235 N.C. 377, 70 S.E.2d 201 (1952), which invalidated a statute that "imposed a duty on the Randolph County Board of Education to provide 'a sewerage system and an adequate water supply' for its schools" because it "relat[ed] to health

and sanitation" given "that 'its sole purpose' was to make sure that school children in Randolph County had access to 'healthful conditions' while at school," did not support the City's position given the directness with which the statute addressed health and sanitation issues.[14]  *City of Asheville*, ___ N.C. App. at ___, 777 S.E.2d at 99 (quoting *Lamb*, 235 N.C. at 379, 70 S.E.2d at 203).  Thus, the Court of Appeals concluded that its decision was fully consistent with this Court's precedent concerning the proper application of Article II, Section 24(a)(1) of the North Carolina Constitution.

The City claims that the Court of Appeals utilized an overly narrow construction of Article II, Section 24 of the North Carolina Constitution that conflicted with its purpose, ignored the distinction between "[r]elating to" and "regulat[ing]," and employed a " 'regulation' standard" stemming from our decision in *Reed* in preference to the approach utilized in our more recent decisions.  In addition, the City asserts that the Court of Appeals' decision conflicts with three lines of decisions from this Court, including (1) a line of decisions, such as *Drysdale*, *City of New Bern*, and *Lamb*, that hold that water and sewer services are inherently

---

[14] As the City points out, the law at issue in *Lamb* did not require the County Board of Education to provide water and sewer services to public school children and to ensure the provision of healthful conditions for Randolph County school children.  Instead, the law "purport[ed] to limit the power of the County Board of Education to provide for sanitation and healthful conditions in the schools by means of a sewerage system and an adequate water supply," *Lamb*, 235 N.C. at 379, 70 S.E.2d at 203, by prohibiting the County Board of Education "from expending 'in excess of two thousand dollars ($2,000.00) under any one project or contract for the purpose of extending any public or private water or sewer system so that such extended system will serve any public school in Randolph County' " absent approval by a majority of voters at a special election, *id.* at 379, 70 S.E.2d at 203 (quoting Act of Apr. 14, 1951, ch. 1075, sec. 1, 1951 N.C. Sess. Laws 1079)

related to health and sanitation; (2) a line of cases, such as *City of New Bern*, *Idol*, *Board of Health v. Board of Commissioners*, 220 N.C. 140, 16 S.E.2d 677 (1941), and *Sams*, that hold that local laws addressing the governance of health-related services relate to health and sanitation; and (3) a line of cases, such as *City of New Bern* and *Williams*, that indicate that the "practical effect" of challenged legislation must be considered in determining whether the act involves one of the prohibited subjects specified in Article II, Section 24(1). On the other hand, the State contends that the analysis employed by the Court of Appeals is firmly grounded in our decision in *Reed*, which remains good law, and that *Lamb* merely establishes that an act involving water and sewer services relates to health and sanitation if it does nothing other than to prescribe the manner in which sewer and water service is provided. In addition, the State contends that the Court of Appeals' decision, rather than impermissibly narrowing the term "[r]elating to," correctly focused upon the purpose of the Act, which, in the State's view, was intended to work a change in the governance of the City's water system. Once again, we find the City's argument persuasive.

In concluding that the legislation is not unconstitutional because it does not "expressly state[ ] that its purpose is to regulate health or sanitation" and because "it is [not] plain and clear," when viewing the Act as a whole, that its "purpose is to regulate health or sanitation," the Court of Appeals placed principal reliance upon our decision in *Reed*. *City of Asheville*, ___ N.C. App. at ___, 777 S.E.2d at 98. In *Reed*, we considered whether legislation that established a procedure pursuant to

which the Buncombe County Board of Commissioners could create sanitary districts for the purpose of providing water and sewer service in rural areas of the county was a local act relating to health, sanitation, and the abatement of nuisances. 188 N.C. at 40-41, 44, 123 S.E. at 479-80, 481. Although this Court upheld the legislation because it was not a local law and did not relate to health and sanitation because it did "not state that its purpose [was] to regulate sanitary matters, or to regulate health or abate nuisances" and was, instead, intended "to provide districts in Buncombe County wherein sanitary sewers or sanitary measures may be provided in rural districts," *id.* at 44, 123 S.E. at 481, the second of these two holdings was substantially limited four years later in *Drysdale*, 195 N.C. at 726-28, 143 S.E. at 532-33, in which this Court invalidated a statute that created a single, special sanitary district in Henderson County as an impermissible local act.[15] In reaching this result, *Drysdale* distinguished *Reed* on the grounds that the legislation at issue in that case "*applied generally to the entire county of Buncombe.*" *Drysdale*, 195 N.C. at 728, 143 S.E. at 533. While the State contends that this Court's decision in *Town of Kenilworth v. Hyder*, 197 N.C. 85, 147 S.E. 736 (1929), treats the "health and sanitation" holding in *Reed* "with unambiguous approval," we decline to read *Hyder* that expansively given

---

[15] In spite of the fact that the Court of Appeals expressed uncertainty about the prohibited subject to which the statute at issue in *Drysdale* "related," it is clear from our opinion that the statute in question was deemed to impermissibly relate to health and sanitation, which is how subsequent opinions of this Court have understood that decision. *E.g.*, *Gaskill v. Costlow*, 270 N.C. 686, 688, 155 S.E.2d 148, 149 (1967); *Sams*, 217 N.C. at 285, 7 S.E.2d at 541.

that it did not utilize the regulation standard employed in *Reed*; looked to *Reed* for the primary purpose of noting that the relevant sanitary district had been established pursuant to the legislation that had been challenged in that earlier case; and stated, in essence, that, since the legislation at issue in *Hyder* was little more than a continuation of the legislation at issue in *Reed* and since the legislation at issue in *Reed* had been upheld by this Court, there was "no convincing reason" for concluding that the legislation at issue in *Hyder* constituted a prohibited local act. *Id.* at 89, 147 S.E. at 738 (citations omitted). As a result, *Reed* provides no basis for a determination that the legislation does not relate to health and sanitation.

In addition, while the stated purpose of the legislation is undoubtedly relevant to the determination of whether a local law violates Article II, Section 24(a), our recent precedent clearly indicates that the practical effect of the legislation is pertinent to, and perhaps determinative of, the required constitutional inquiry. *E.g.*, *Williams*, 357 N.C. at 189, 581 S.E.2d at 429 (concluding that, while "the record demonstrates that . . . the intent of the enabling legislation and the Ordinance [enacted pursuant to the authority granted by the challenged legislation] is to prohibit discrimination in the workplace, the effect of these enactments is to govern the labor practices of [certain businesses] in Orange County"); *City of New Bern*, 338 N.C. at 434-42, 450 S.E.2d at 737-42 (concluding that the challenged legislation, which shifted the responsibility for enforcing the State Building Code with respect to certain buildings from the City of New Bern to Craven County, constituted

unconstitutional local acts related to health and sanitation). As a result, the approach adopted by the Court of Appeals for determining whether the legislation constituted an impermissible local law relating to health and sanitation departs from that required by our precedents, properly understood.

Admittedly, this Court has not, to date, clearly indicated when a local act does and does not "relate" to a prohibited subject for purposes of Article II, Section 24. Although "related" can be defined as "[c]onnected in some way; having a relationship to or with something else," *Related, Black's Law Dictionary* (10th ed. 2014), we cannot conclude that the existence of a tangential or incidental connection between the challenged legislation and health and sanitation is sufficient to trigger the prohibition worked by Article II, Section 24(1)(a) of the North Carolina Constitution. On the other hand, we recognize that, as a purely textual matter, "relating to" is not equivalent to "regulating." *Compare* N.C. Const. art. II, § 24(1)(a) ("[r]elating to health, sanitation, and the abatement of nuisances"), *with id.* art. II, § 24(1)(j) ("[r]egulating labor, trade, mining, or manufacturing"); *see generally Williams*, 357 N.C. at 189, 581 S.E.2d at 429 (defining "regulate" as " 'to govern or direct according to rule[,] . . . to bring under [ ] control of law or constituted authority' " (quoting *State v. Gulledge*, 208 N.C. 204, 208, 179 S.E. 883, 886 (1935) (ellipsis in original), (*quoted in Cheape v. Town of Chapel Hill*, 320 N.C. 549, 559, 359 S.E.2d 792, 798 (1987) (applying that definition of "regulate" to Article II, Section 24(1)(j))). As a result, in light of the relevant constitutional language and the import of our prior decisions

interpreting and applying the prohibition set out in Article II, Section 24 of the North Carolina Constitution, the ultimate issue that we must decide in this case is whether, in light of its stated purpose and practical effect, the legislation has a material, but not exclusive or predominant, connection to issues involving health, sanitation, and the abatement of nuisances.

In view of the fact that "[p]ure water is the very life of a people," *Drysdale*, 195 N.C. at 732, 143 S.E. at 535, and the broad interpretation that this Court has given to Article II, Section 24(1)(a) since *Reed*,[16] we have no hesitation in concluding that the legislation impermissibly relates to health and sanitation. As an initial matter, we note that the stated purpose of the legislation is to "provide reliable, cost-effective, high-quality water and sewer services" to affected customers. Ch. 50, pmbl., 2013 N.C. Sess. Laws at 118. Although the State contends that the purpose-related language contained in the legislation implicates issues such as customer service rather than the healthfulness of the water that is provided to customers for cooking, cleaning, and personal consumption, the substantiality of the relationship between

---

[16] The only time that this Court has rejected a claim that a local law impermissibly "related to" health and sanitation after *Reed* occurred in *Piedmont Ford Truck Sale, Inc. v. City of Greensboro*, 324 N.C. 499, 380 S.E.2d 107 (1989), in which we held that a local act obligating the City of Greensboro to provide solid waste collection to newly annexed areas did not relate to health and sanitation given that the "effect" of the local act was to make a general law of statewide application applicable to an annexation being effectuated by the adoption of a local act and given that the challenged legislation did not "subject the annexed area to a different treatment than" would have been the case if Greensboro "had annexed the area under the general annexation law." *Id.* at 505, 380 S.E.2d at 111.

the purity of the water that customers receive and the quality of service provided to water customers is beyond serious dispute. Thus, the stated purpose for the enactment of the legislation demonstrates the existence of a material connection between the reason for its enactment and issues involving public health and sanitation.[17]

An analysis of the practical effect of the legislation reinforces the strength of the connection between the issues addressed in the legislation and public health and sanitation. As an initial matter, we note that the City, in the course of operating its water system, is required to ensure compliance with the North Carolina Drinking Water Act, N.C.G.S. §§ 130A-311 to -329 (2015), which appears in a chapter of the General Statutes entitled "Public Health" (Chapter 130A) and which is intended "to regulate water systems within the State which supply drinking water that may affect the public health," *id.* § 130A-312. In view of the fact that the City's water system is a "public water system" for purposes of the North Carolina Drinking Water Act, *see*

---

[17] Although the Court of Appeals reasoned, in reliance upon its 2008 decision in *Asheville I,* that a provision in the legislation at issue here allowing for the discontinuance of water and sewer services by a metropolitan water and sewerage district for nonpayment "belies [the City's] argument that the purpose of the [legislation] relates to health and sanitation," *City of Asheville,* ___ N.C. App. at ___, 777 S.E.2d at 98, we do not find this argument persuasive. A careful analysis of the Sullivan Acts reveals that each of them was intended to address economic, rather than health and sanitation, issues given that they prohibited the City from charging higher extraterritorial rates, required the City to place funds derived from its water system in a separate account, and precluded the City from transferring monies derived from the operation of the water system to any fund that was not related to the operation and maintenance of the system. *Asheville I*, 192 N.C. App. at 36-39, 665 S.E.2d at 127-30.

*id.* § 130A-313(10), the City must show compliance with the North Carolina Drinking Water Act and related regulations in order to obtain approval from the North Carolina Department of Environmental Quality for the construction, alteration, and additions to water system facilities, *see id.* § 130A-317 (c), (d); Asheville, N.C., Code of Ordinances, ch. 21 (2016). In addition, the City is required to ensure that its water treatment operators are certified pursuant to N.C.G.S. §§ 90A-20 to 90A-32 in order to "protect the public health and to conserve and protect the water resources of the State." N.C.G.S. § 90A-20 (2015). Finally, the City is required to provide annual reports concerning the source and quality of the water that it provides to its customers, including the existence of any identified risks to human health stemming from consumption of the water provided by its system. *See* 40 C.F.R. §§ 141.151–.155 (2016). As a result, consistent with its stated purpose, the legislation has material health and sanitation effects.

The fact that the legislation changes the governance of the City's water system does not operate to remove it from the prohibition worked by Article II, Section 24(1)(a) of the North Carolina Constitution. As we have clearly held, a local act that shifts responsibility for enforcing health and safety regulations from one entity to another clearly relates to health and sanitation. *E.g.*, *City of New Bern*, 338 N.C. at 440, 450 S.E.2d at 741 (invalidating local legislation that shifted responsibility for enforcing the State Building Code with respect to certain buildings from the City of New Bern to Craven County given that "the Building Code Council's stated purposes

for the different inspections under the Code evince an intent to protect the health of the general public," that "[t]he Code regulates plumbing in an effort to maintain sanitary conditions," and that "enforcement of the fire regulations protects lives from fire, explosion and health hazards"); *see also Idol*, 233 N.C. at 733, 65 S.E.2d at 315 (finding it clear "beyond peradventure" that legislation authorizing the consolidation of the Winston-Salem and Forsyth County health departments and providing for the appointment of a joint city-county board for administering the public health laws in the affected jurisdictions was a prohibited "local act relating to health"); *Bd. of Health v. Bd. of Comm'rs*, 220 N.C. at 143, 16 S.E.2d at 679 (emphasizing this Court's "commit[ment] to the proposition that a law affecting the selection of officers to whom is given the duty of administering the health laws is a law 'relating to health' " in the course of invalidating a local law requiring that the county health officer appointed by the county board of health be confirmed by the Nash County Board of Commissioners) (citing *Sams*, 217 N.C. 284, 7 S.E.2d at 540)). As a result, given the fact that the legislation works a change in the governance of the City's water system, our prior decisions reinforce, rather than undercut, our conclusion that the legislation impermissibly relates to health and sanitation in violation of Article II, Section 24(1)(a) of the North Carolina Constitution.

As the State and our dissenting colleague note, Article VII, Section 1 of the North Carolina Constitution provides, in pertinent part, that

> [t]he General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions, and, except as otherwise prohibited by this Constitution, may give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable.

N.C. Const. art. VII, § 1. Although North Carolina is not a home rule jurisdiction, and although our constitution, consistent with the language of this provision, gives the General Assembly exceedingly broad authority over the "powers and duties" delegated to local governments, *id.*, that authority is subject to limitations imposed by other constitutional provisions.[18] Aside from the fact that the legislation does not actually prohibit the City from operating a water system, the General Assembly's authority over the "powers and duties" delegated to local governments is expressly subject to the limitations set out in Article II, Section 24, which "is the fundamental law of the State and may not be ignored." *High Point Surplus Co.*, 264 N.C. at 656,

---

[18] The legislation cannot be properly understood as nothing more than an exercise of the General Assembly's plenary authority to create new units of local government. Instead of simply creating a new unit of local government, the General Assembly took a number of actions in the legislation, including creating the Metropolitan Water and Sewerage District through a repurposing of the Metropolitan Sewerage District and effectively eliminating the City's ability to operate its existing water system. In similar instances, such as *Idol*, 233 N.C. at 733, 65 S.E.2d at 315, which involved legislation creating a joint city-county board of health, and *Sams,* 217 N.C. at 285-86, 7 S.E.2d at 541, which involved legislation creating a county board of health, this Court invalidated the challenged legislation as impermissible local laws relating to health and sanitation even though the legislation at issue in those cases involved the creation of new units of local government like the one at issue here.

142 S.E.2d at 702. As a result,[19] for all these reasons, we reverse the Court of Appeals'

decision and instruct that court to reinstate the trial court's order granting summary

judgment in favor of the City.[20]

REVERSED.

Justice NEWBY dissenting.

Throughout our history, when communities needed a governmental provision

of water and sewer services, the General Assembly, by local act, would grant a local

government unit the authority to act. Here the majority's holding ignores this

historic constitutional understanding of the plenary authority of the General

---

[19] In view of our conclusion that the legislation is an unconstitutional local law relating to health and sanitation, we need not address the City's challenge to the Court of Appeals' holding that the legislation did not result in a compensable taking and express no opinion concerning its correctness.

[20] Although the General Assembly has, in the past, enacted legislation authorizing various units of local government to operate systems for the provision of water service, we do not believe that our decision in this case in any way impairs the ability of the affected units of local government to operate their water systems in a lawful manner. Aside from the fact that we do not know whether such legislation could be properly characterized as local, rather than general, in nature or relates to health and sanitation under the test that we have deemed appropriate in this case and the fact that the legislation in question appears to have allowed the initial provision of water service rather than requiring the reallocation of the responsibility for providing water and sewer service from one entity of local government to another, the current effect of any such legislation would be to allow the affected unit of local government to do what has otherwise been authorized by general legislation, an outcome which this Court held did not result in a violation of Article II, Section 24 in *Piedmont Ford Truck Sale*, 324 N.C. at 502, 380 S.E.2d at 111.

Assembly to oversee local government subdivisions and create new ones when necessary. Our history and our constitution recognize this plenary authority is necessary because the General Assembly is uniquely situated to oversee local government and address changing needs. Now the Court brings uncertainty as to whether there are any lawfully established water or sewer districts in North Carolina. Even assuming the legislation at issue is a local act, the legislature first gave the City of Asheville, and countless other municipalities across our State, its water district by local act. If it is unlawful to modify that district by local act, then it was unlawful to establish it by local act initially. The majority's complicated analysis casts this Court in the ill-suited role of legislating which local governmental authorities shall govern various water and sewer services. Because the General Assembly exercises its plenary authority in creating a water and sewer district, its action is constitutional. Accordingly, I respectfully dissent.

This Court presumes that legislation is constitutional absent an express constitutional prohibition on the legislature's otherwise plenary police power and until its unconstitutionality is plainly and clearly demonstrated beyond a reasonable doubt. *E.g., Hart v. State*, 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015); *see also Kornegay v. City of Goldsboro*, 180 N.C. 441, 445, 105 S.E. 187, 189 (1920) ("[C]ourts always presume[,] in the first place[,] that the act is constitutional . . . [and] that the Legislature acted with integrity and with an honest purpose to keep within the restrictions and limitations laid down by the Constitution." (quoting *Lowery v. Bd. of*

*Graded Sch. Trs.*, 140 N.C. 33, 40, 52 S.E. 267, 269 (1905)). The presumptive constitutional power of the General Assembly to act is consistent with the principle that a restriction on the General Assembly is in fact a restriction on the people. *See Baker v. Martin*, 330 N.C. 331, 336-37, 410 S.E.2d 887, 890 (1991). Thus, this Court is powerless to review an act of the people through the General Assembly for its political propriety so long as it reasonably relates to the need sought to be remedied and falls within legislative discretion. *Greensboro-High Point Airport Auth. v. Johnson*, 226 N.C. 1, 8, 36 S.E.2d 803, 809 (1946).

The General Assembly has long enjoyed plenary power to create political subdivisions of local government,[21] and this authority has been reaffirmed with each adoption of our state constitution. N.C. Const. art. VII, § 1; N.C. Const. of 1868, Amends. of 1875, art. VII, § 14 ("The General Assembly shall have full power by statute to modify, change, or abrogate any and all of the provisions" pertaining to municipalities.); *id.*, art. VIII, § 4 ("It shall be the duty of the Legislature to provide

---

[21] Before its express inclusion in the 1868 state constitution, this Court recognized the General Assembly's historic duty and plenary power to create and abolish political subdivisions of local government. *See, e.g.*, *White v. Comm'rs of Chowan Cty.*, 90 N.C. 437, 438 (1884) (County subdivisions "are indeed a necessary part and parcel of the subordinate instrumentalities employed in carrying out the general policy of the state in the administration of government . . . [and their functions] may be enlarged, abridged, or modified at the will of the legislature . . . [as] they are intended only to be essential aids and political agencies."); *see also Lilly v. Taylor*, 88 N.C. 489, 494-95 (1883) (affirming the legislature's creation and subsequent repeal of the charter of the Town of Fayetteville); *Mills v. Williams*, 33 N.C. (11 Ired.) 558, 563-64 (1850) (upholding the legislature's "power to create and abolish" Polk County).

for the organization of cities, towns and incorporated villages . . . ."); *see also Report of the North Carolina State Constitution Study Commission* 143 (1968) [hereinafter *1968 Constitution Commission Report*] (recognizing "the General Assembly['s] full power to revise or abolish the form and powers of county and township governments").

The General Assembly creates governmental subdivisions to facilitate local self-government, dividing governing authority between local governmental units that may otherwise compete for jurisdiction. *See Hailey v. City of Winston-Salem*, 196 N.C. 17, 22, 144 S.E. 377, 380 (1928) ("When a new governmental agency is established by the Legislature, such as a municipal corporation, it takes control of all the affairs over which it is given authority, to the exclusion of other governmental agencies."). Local governmental subdivisions are "parts and parcels of the State, organized for the convenience of local self-government," *People ex rel. Van Bokkelen v. Canaday*, 73 N.C. 198, 222 (1875), which the General Assembly may create, organize, abolish, arrange, and rearrange to meet local needs. *See also Town of Boone v. State*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (2016) (No. 93A15-2); *Holmes v. City of Fayetteville*, 197 N.C. 740, 746, 150 S.E. 624, 627 (1929) (recognizing municipalities as "mere instrumentalities of the State for the more convenient administration of local government"), *appeal dismissed per curiam*, 281 U.S. 700, 50 S. Ct. 353, 74 L. Ed. 1126 (1930).

Moreover, the legislature can create "separate corporate agenc[ies] to serve [ ] particular governmental purposes" and "call upon them to perform such functions as

the Legislature may deem best." *Johnson*, 226 N.C. at 9-10, 36 S.E.2d at 809 (citing *Brockenbrough v. Bd. of Water Comm'rs*, 134 N.C. 1, 17, 46 S.E. 28, 33 (1903)). "A municipality acting in its governmental capacity is an agency of the State for the better government of those residing within its corporate limits . . . ." *Candler v. City of Asheville*, 247 N.C. 398, 406, 101 S.E.2d 470, 476 (1958); *see also McCormac v. Commr's of Robeson Cty.*, 90 N.C. 441, 444 (1884) ("[I]t is within the power and is the province of the legislature to . . . invest the inhabitants . . . with corporate functions, more or less extensive and varied in their character, for the purposes of government . . . ."). The General Assembly is the political body designated to oversee local government and to make necessary modifications as local conditions change. In organizing local government, and making necessary modifications, the General Assembly must weigh competing local interests and needs. Ultimately, the legislature alone must determine the propriety of changes in local government by exercising its political judgment.

This broad historic power of the General Assembly, acknowledged by our case law, has remained unchanged and is now expressly incorporated into Article VII, Section 1 of our current constitution, adopted in 1971:

> The General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions, and, except as otherwise prohibited by this Constitution, may give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable.

N.C. Const. art. VII, § 1. As such, Article VII, Section 1 "is not a delegation of power to the General Assembly" but "a general description" and "merely a recognition" of "the General Assembly's power to provide for the organization and powers of local government," *1968 Constitution Commission Report* 85, as affirmed in the 1875 amendment, which "gave the General Assembly full power to revise or abolish the form and powers of county and township governments," *id.* at 143.

By its plain meaning, the text of the first clause, "[t]he General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions," mandates the statutory creation and structuring of local governmental subdivisions. *See State v. Webb*, 358 N.C. 92, 97, 591 S.E.2d 505, 510-11 (2004) (The constitution is construed for its plain meaning.); *see also Dunn v. Pac. Emp'rs Ins. Co.*, 332 N.C. 129, 134, 418 S.E.2d 645, 648 (1992) (Ordinary rules of grammar apply.). "Organization" means something "put together into an orderly, functional, [and] structured whole." *Organize*, *The American Heritage Dictionary* 926 (new coll. ed. 1979). "Government" is defined as "[t]he act or process of governing; especially, the administration of public policy in a political unit; political jurisdiction." *Government, id.* at 570. The "fixing of boundaries" means establishing borders or limits. *See Fix* and *Boundary, id.* at 497, 156. "Other governmental subdivisions" includes a "special-purpose district or authority," *Local Government, Black's Law Dictionary* (10th ed. 2014), such as an

administrative water district, operated in compliance with principles, rules, and regulations, *see id.* (listing examples of local government units). Thus, the plain meaning of the phrase "organization and government and the fixing of boundaries" embraces the creation, expansion, retraction, and dissolution of all forms of local government, including "other governmental subdivisions."[22]

Our case law has historically treated "other governmental subdivisions" similarly to traditional political subdivisions. *See Town of Saluda v. Polk County*, 207 N.C. 180, 186, 176 S.E. 298, 301-02 (1934) ("[T]he legislature alone can create, directly or indirectly, counties, townships, school districts, road districts, and the like subdivisions, . . . to effectuate the purposes of the government . . . . Such organizations are intended to be instrumentalities and agencies employed to aid in the administration of the government, and are always under the control of the power that created them, unless the same shall be restricted by some constitutional limitation." (quoting *McCormac*, 90 N.C. at 444-45)); *see also* N.C.G.S. § 162A-65 (2015) (defining "political subdivision" for purposes of water and sewer authorities as "any county, city, town, incorporated village, sanitary district, water district, sewer district, special purpose district or other political subdivision," *id.* § 162A-65(a)(8), and "governing body" as "the board, commission, council or other body . . . of a political

---

[22] *See Town of Boone*, ___ N.C. at ___, ___ S.E.2d at ___ (Ervin, J., concurring in result) ("[T]he plain language in which the provision in question is couched suggests to me that 'organization and government' refers to the creation of units of local government and the manner in which those units of local government are governed . . . .").

subdivision in which the general legislative powers . . . of such political subdivision are exercised," *id.* § 162A-65(a)(6)). As such, the text of the first clause of Article VII, Section 1 contemplates the legislative creation of local governmental subdivisions, along with counties, cities, and towns, without constitutional limitation.

The second clause of Article VII, Section 1 concerns the authority of the General Assembly to confer specific "powers and duties" on local governmental units. Unlike the first clause, the second clause in Article VII, Section 1 includes an express limitation; namely, it prohibits any legislative delegation of "powers and duties" to local governmental units that is "otherwise prohibited by this Constitution." Only under the second clause, then, is the General Assembly's authority over local governments expressly subject to limitations imposed by other constitutional provisions, including the constraints on local acts listed in Article II, Section 24 first adopted in 1917. For example, under the Article II, Section 24 prohibition on certain local acts, the General Assembly cannot grant to one county the power to enact local employment legislation, *see Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 191, 581 S.E.2d 415, 430 (2003), or remove a city's power to enforce certain ordinances regarding specific properties within its municipal limits, *see City of New Bern v. New Bern–Craven Cty. Bd. of Educ.*, 338 N.C. 430, 442, 450 S.E.2d 735, 742 (1994).[23] *See also Town of Boone*, ___ N.C. at ___, ___ S.E.2d at ___.

---

[23] This approach of conducting an Article II, Section 24 analysis only when the challenged statute specifies a specific "power" or "duty" is consistent with our prior decisions.

The question before this Court is whether the legislation at issue, Act of May 2, 2013, ch. 50, 2013 N.C. Sess. Laws 118 (the District Act), which creates a new regional district to govern water and sewer services within certain areas of Buncombe and Henderson Counties, is an exercise of the General Assembly's plenary authority to "provide for the organization and government and the fixing of boundaries" of local government under the first clause of Article VII, Section 1 or whether it confers specific "powers and duties" on a local governmental unit under the second clause. If the General Assembly's action creating the regional water and sewer district arises under its plenary authority recognized in the first clause of Article VII, Section 1, the

---

In *Piedmont Ford Truck Sale, Inc. v. City of Greensboro*, the plaintiffs challenged a local act annexing certain land to the City of Greensboro. 324 N.C. 499, 501, 380 S.E.2d 107, 108 (1989). While the annexation clearly arose under the authority to "fix the boundaries of cities" acknowledged in Article VII, Section 1, *id.* at 503, 380 S.E.2d at 110, because the act also contained a specific "provision regarding solid waste collection," the plaintiffs argued the statute violated Article II, Section 24, *id.* at 504, 380 S.E.2d at 110. Because the statute specified a particular "power," this Court conducted an analysis under Article II. *Id.* at 504-06, 380 S.E.2d at 110-11. When viewed as a whole, the explicit grant of power was a "small part" of the legislation, *id.* at 506, 380 S.E.2d at 111, and this Court concluded that "[t]he provision . . . regarding solid waste collection" did not violate Article II, Section 24, *id.* at 506, 380 S.E.2d at 111. *See also, e.g.*, *Lamb v. Bd. of Educ.*, 235 N.C. 377, 379-80, 70 S.E.2d 201, 203 (1952) (concluding that an act expressly restricting certain express powers of the Randolph County Board of Education violated the Article II limitations on local acts); *Idol v. Street*, 233 N.C. 730, 733, 65 S.E.2d 313, 315 (1951) (concluding that an act that "confer[red] power upon the Board of Aldermen of the City of Winston-Salem and the Board of Commissioners of Forsyth County" to, *inter alia*, "name a joint city-county board of health," which varied from general law, "[wa]s a local act relating to health" in violation of the Article II limitations on local acts); *Bd. of Health v. Bd. of Comm'rs*, 220 N.C. 140, 143-44, 16 S.E.2d 677, 678-79 (1941) (concluding that an act removing from the Nash County Board of Health the power to appoint a county health officer was a local act relating to health in violation of the Article II limitations on local acts).

analysis ends, and there is no need to address the application of the second clause and any restrictions imposed by Article II, Section 24.

As admitted by the City, the District Act creates a new political subdivision. Moreover, the statutory text of the District Act provides for the organization and government of that new political subdivision. The stated purpose of the District Act is to enhance services to users by creating a regional water and sewer system to "provide reliable, cost-effective, high-quality water and sewer *services*." Ch. 50, 2013 N.C. Sess. Laws at 118 (emphasis added). Creating this type of local governmental subdivision to enhance water and sewer services falls squarely within the legislature's plenary power as described in the first clause of Article VII, Section 1, and thus the District Act is constitutional.

Initially established by local act in 1883, the City's public water "system currently serves approximately 124,000 customers, some 48,000 of whom are located outside Asheville's city limits" in portions of Buncombe and Henderson Counties. *See* N.C.G.S. § 160A-312(a) (2015) (authorizing a city to operate a water supply and distribution system inside and "outside its corporate limits, within reasonable limitations"). In 2013 the General Assembly created a new local governmental subdivision to provide regional water and sewer services to the City and those portions of Buncombe and Henderson Counties. Ch. 50, 2013 N.C. Sess. Laws 118 (captioned "An Act to Promote the Provision of Regional Water and Sewer Services

by Transferring Ownership and Operation of Certain Public Water and Sewer Systems to a Metropolitan Water and Sewerage District.").

The "transfer provision" regionalizes water and sewer services by combining the City's public water system with the Metropolitan Sewerage District operating in the same county to form a new governmental subdivision. The transfer provision provides in part: "All assets, real and personal, tangible and intangible, and all outstanding debts . . . are by operation of law transferred to the metropolitan sewerage district operating in the county where the public water system is located, to be operated as a Metropolitan Water and Sewerage District . . . ." *Id.*, sec. 1(a), at 118. All assets and all outstanding debts of both the City's water system and the Metropolitan Sewerage District transfer to the new regional district. *Id.*, sec. 1(b)-(c), (f), at 119.[24] The transfer between the City and the Metropolitan Sewerage

---

[24] "All necessary permits for operation" are also "transferred to the Metropolitan Water and Sewerage District . . . to ensure that no current and paid customer loses services due to the regionalization of water and sewer services." *Id.*, sec. 1(e), at 119. Moreover, the General Trust Indenture, which governs the bonds issued and secured by a pledge of "[a]ll Net Revenues of the Water System," contemplates a transfer "to another political subdivision or public agency in the State authorized by law to own and operate such systems." The trustee allows a transfer "if such political subdivision . . . assumes all of the obligations of the City under this Indenture" and if the transfer does not produce a "material adverse effect on the ability of the Water System to produce Revenues," on the bond rating, or with regard to tax treatment. These revenue bonds do not rely upon the City's taxing power. *See also* Ch. 50, sec. 2, 2013 N.C. Sess. Laws, at 122 (requiring that the rates and fees "pledged to the payment of revenue bonds" be sufficient to maintain the system).

District occurs by operation of law[25] because both systems operate in the same county and meet certain criteria. *See id.*, sec. 1(a)-(f), at 118-19.

By its terms and stated purpose, the District Act creates a regional governance solution for water and sewer systems and defines a "metropolitan water and sewerage district" as a political subdivision and deems it "a public body . . . exercising . . . essential governmental functions to provide for the preservation and promotion of the public health and welfare." *Id.*, sec. 2, at 121.[26] The newly created regional district combines the authority of the previously separate water and sewer districts "[t]o do all acts and things necessary or convenient to carry out the powers granted by this Article." *Id.* at 122. Overall, the regional district operates with the same power as a city in enforcing its ordinances, and the district board may not privatize its water and sewer services. *See id.*

Likewise, the District Act amends N.C.G.S. § 162A-85.3 to provide for the organization and governance of metropolitan water and sewerage districts like the one created here, including a governing board with regional representation. *Id.* at

---

[25] Governing bodies of other political subdivisions may establish regional systems by joint resolution. *See* Ch. 50, sec. 5.5, 2013 N.C. Sess. Laws, at 125 (requiring consent from county commissioners and all municipal governing boards affected before creation of district).

[26] The District Act amended the definitions of "unit of local government" and "municipality" to include "metropolitan water and sewerage districts" and added "metropolitan water and sewerage districts" to the list of political subdivisions that may borrow money and issue bonds. Ch. 50, sec. 2, 2013 N.C. Sess. Laws, at 119-20; *see also* N.C.G.S. § 159-44(4) (2015) (defining a "unit of local government"); *id.* § 159-48(e) (2015) (borrowing and bond issuing); *id.* § 159-81(1) (2015) (defining a "municipality"); *id.* § 159-81(3) (2015) (revenue-bond issuing).

120-21.[27] The District Act requires the regional district board to work with local municipalities under its jurisdiction for the benefit of the district.[28] The district board performs administrative tasks such as fixing rates, fees, rents, and other charges for the services furnished or to be furnished by the district water and sewer system. *See id.* at 122 ("Such rates, fees, and charges may not apply differing treatment within and outside the corporate limits of any city or county within the jurisdiction of the district board" and "shall not be subject to supervision or regulation by any . . . agency of the State or of any political subdivision."). In sum, as admitted by the City, the act

---

[27] Generally, the District Act requires that the apportionment of members on the district board be representative of the area serviced while considering population. *See* Ch. 50, sec. 2, 2013 N.C. Sess. Laws, at 120 (two from each county served); *id.* (one from each municipality served); *id.* (two from each municipality served with a population greater than 200,000); *id.* (one from each county served with a population greater than 200,000); *id.* ("One individual from a list submitted by the governing body of a county in which a watershed serving the district board is located in a municipality not served by the district . . . ."); *id.*, at 121 ("One individual by the governing body of any elected water and sewer district wholly contained within the boundaries of the district."). "[T]he district board may expand to include other political subdivisions if" the additional political subdivision "become[s] a participant in the district board." *Id.*

The District Act also sets terms for members and provides procedures for meetings, removal of members, filling vacancies on the district board, and the election and compensation of officers. *Id.* Until all appointments are made, the district board of the County's metropolitan sewerage district "shall function as the district board of the Metropolitan Water and Sewerage District." *Id.*, sec. 1(d), at 119.

[28] The District Act outlines the permissible authority for the local governing bodies within the regional district's jurisdiction. *See, e.g.*, Ch. 50, sec. 2, 2013 N.C. Sess. Laws, at 122-23 (regulating the transfer of jurisdiction from smaller systems to the regional district system for the benefit of the district, contracting with the district, revising rates or collecting taxes to pay obligations to the district, and submitting to its electors agreements with the district). When possible, the district board must coordinate with the local municipalities when constructing any system improvements. *Id.* at 123.

creates a new "governmental subdivision" and provides for the "organization and government" thereof.

The broad constitutional authority acknowledged in the text of the first clause of Article VII, Section 1 clearly affirms the legislature's ability to create and organize political subdivisions to meet changing needs, resolve disputes between local governments, and provide new governance solutions. The General Assembly's constitutional authority to do so remains even if its solution combines, divides, or regionalizes the political power of preexisting subdivisions that once governed local issues. Here it seems the General Assembly, in its discretion and in accordance with the District Act's stated purpose, finds regional governance over certain water systems will ensure high quality water and sewer services.

> The role of the legislature is to balance the weight to be afforded to disparate interests and to forge a workable compromise among those interests. The role of the Court is not to sit as a super legislature and second-guess the balance struck by the elected officials . . . [but] only to measure the balance struck by the legislature against the required minimum standards of the constitution.

*Henry v. Edmisten*, 315 N.C. 474, 491, 340 S.E.2d 720, 731 (1986). The General Assembly's policy decision here falls within legislative discretion and, as an exercise of legislative authority under the first clause of Article VII, Section 1, does not implicate the constitutional constraints described in Article II, Section 24.

Assuming the District Act is a local act[29] as held by the majority, notably the legislature first created a water district for Asheville by local act.[30] When creating

---

[29] The statutory definition of "local act" in reference to cities and towns "means an act of the General Assembly applying to one or more specific cities by name, or to all cities within one or more specifically named counties." N.C.G.S. § 160A-1(5) (2015). The District Act does not refer to the City of Asheville by name.

[30] In 1883 the General Assembly appointed the Asheville Committee on Permanent Improvements as trustee to oversee a $20,000 fund provided for "water supply." Act of Feb. 28, 1883, ch. 66, sec. 2, 1883 N.C. Priv. [Sess.] Laws 752, 753. The legislature followed suit with other municipalities and subdivisions. *E.g.*, Act of Mar. 11, 1889, ch. 219, sec. 105, 1889 N.C. Priv. [Sess.] Laws 899, 924 (appointing the Board of Alderman for City of Greensboro to manage and regulate "water-works" which "may be established, or land on which water-pipes are run to and from said works"); *id.* sec. 107, at 924 (same for "system of sewerage"); Act of Dec. 20, 1815, ch. XVII, sec. II, 1815 N.C. [Sess.] Laws 18, 18 (empowering and appointing City of Charlotte board of commissioners to "erect pumps or wells").

The General Assembly revised the charter of the City of Asheville to provide for its water authority in 1901, conferring upon the Board of Alderman the power "[t]o provide a sufficient supply of pure water for said city, fix charges and rates therefor, and prescribe rules and regulations governing the use of same," Act of Mar. 13, 1901, ch. 100, sec. 30, 1901 N.C. Priv. [Sess.] Laws 222, 232, which included "construction, operation, repair and control of such water-works," *id.*, sec. 66, at 259. The legislature designated a separate subdivision of government, the Board of Health, to take "general charge and supervision of . . . the healthfulness of the water supply." *Id.*, sec. 32, at 234. In 1923 the General Assembly revised the charter and restructured the local government, empowering a Board of Commissioners to "build and construct" waterworks and sewerage systems, Act of Jan. 26, 1923, ch. 16, sec. 306, 1923 N.C. Priv. [Sess.] Laws 88, 154, both within the City limits and beyond, *id.*, sec. 353, at 167, as well as a Commissioner of Public Works to supervise the systems, *id.*, sec. 25, at 96.

In 1931 the legislature revised the charter again, which remains the charter today, subject to various amendments. Act of Mar. 30, 1931, ch. 121, 1931 N.C. Priv. [Sess.] Laws 154. Under this charter, the General Assembly created a Department of Finance to take charge of "the supervision and control of and over the water system and supply," *id.*, sec. 32, at 161, and to "collect for the use of water," *id.* at 163; *see also* Act of Apr. 6, 1951, ch. 618, 1951 N.C. Sess. Laws 554, 554 (allowing "the City of Asheville, Buncombe County and political units therein to contract" for the water system).

In 1981 the legislature expressly repealed these charter provisions related to the supervision and control of the water system, Act of Feb. 16, 1981, ch. 27, sec. 3, 1981 N.C. Sess. Laws 13, 14, removing control from the Department of Finance and appointing a new

and organizing political subdivisions under its plenary power as recognized in the

first clause of Article VII, Section 1, the legislature often must address the local needs

and competing political pressures of a geographic area. *See Town of Boone*, ___ N.C.

at ___, ___ S.E.2d at ___. If, as the majority declares, creating and organizing a new

water and sewer district is unconstitutional, would not the original act establishing

Asheville's water district also be unconstitutional? The need to organize water and/or

sewer systems arose in localities across the state at different times. The General

Assembly authorized various units of local government or created new ones to meet

those needs as they arose or changed. Under the majority's reasoning, all of the

locally legislated and similarly empowered districts would have been illegally

created.[31] If the creation of a local governmental subdivision, as in the District Act,

---

political subdivision to handle the authority. In 1981 the City and Buncombe County then entered into a comprehensive local agreement that established, *inter alia*, an agency to administer the jointly-owned water supply and distribution systems.

[31] *See, e.g.*, Act of June 29, 1967, ch. 1019, sec. 1, 1967 N.C. Sess. Laws 1463, 1463 (permitting the Town of Taylorsville and Alexander County to purchase a water system); Act of Apr. 5, 1951, ch. 550, secs. 1, 2, 1951 N.C. Sess. Laws 461, 461 (appointing Town of Dunn as new entity to acquire, build, manage, and operate the "water and sewerage system" for the "unincorporated village of Erwin in Harnett County"); Act of Apr. 5, 1947, ch. 1040, sec. 3, 1947 N.C. Sess. Laws 1519, 1520 (creating a "Board of Power, Water and Airport Commissioners of the City of High Point . . . to construct, to improve, [and] to better . . . [the] water system"); Act of Jan. 30, 1945, ch. 24, sec. 1, 1945 N.C. Sess. Laws 37, 37 (moving all water-related property from the Board of Water Commissioners to the City of Charlotte, a separate corporation); Act of Jan. 18, 1939, ch. 1, sec. 1, 1939 N.C. Pub.-Local [Sess.] Laws 11, 11 (establishing "sanitary districts" in Forsyth County); Act of May 3, 1935, ch. 418, sec. 1, 1935 N.C. Pub.-Local [Sess.] Laws 378, 378 (establishing joint water and sewer systems for Haywood County municipalities); Act of Jan. 26, 1923, ch. 1, sec. 1, 1923 N.C. Priv. [Sess.] Laws 1, 1 (extending the "waterworks system" for the Town of Lenoir); Act of Jan. 1, 1917, ch. 71, sec. 2, 1917 N.C. Priv. [Sess.] Laws 134, 134 (establishing a separate entity, the Board

is scrutinized under the second clause of Article VII, Section 1, all such water and sewer districts would receive the same review if challenged, and would be struck down as prohibited local acts. Moreover, the majority, in contravention of our heightened standard for reviewing the constitutionality of legislative acts, presumes the legislature enacted the District Act in bad faith and that its enactment will result in poor local governance. *See Kornegay*, 180 N.C. at 445, 105 S.E. at 189 (presuming "the Legislature acted with integrity and with an honest purpose to keep within the restrictions and limitations laid down by the Constitution").

The General Assembly is the only body politic with the oversight and authority to create and organize local political subdivisions in its discretion. It alone has the ability to resolve local governance disputes such as those undergirding the litigious past of the water system at issue.

Spanning almost a century, legislation and litigation chronicle the strained relationship between the City of Asheville's water system and its County water customers. *See* Act of Apr. 28, 1933 (Sullivan I), ch. 399, 1933 N.C. Pub.-Local [Sess.] Laws 376 (captioned "An Act to Regulate Charges Made by the City of Asheville for Water Consumed in Buncombe County Water Districts"); *Candler*, 247 N.C. at 411, 101 S.E.2d at 479 (recognizing the legislature's power to prevent by statute the City

---

of Water Commissioners, to "provide for the better management and proper operation of the . . . water-works system of the city of Durham").

of Asheville from charging certain county residents higher rates than it charged to city residents). After several amendments and reinstatements of the joint agreement between the City and the County that was first established in 1981, that agreement ended in 2004, ultimately leaving the City with ownership and control of the water system. Again, it seems the parties soon after resorted to the legislature and the courts. *See* Act of June 29, 2005 (Sullivan II), ch. 140, 2005 N.C. Sess. Laws 244 (captioned "An Act Regarding Water Rates in Buncombe County"); Act of June 29, 2005 (Sullivan III), ch. 130, 2005 N.C. Sess. Laws 243 (captioned "An Act Regarding the Operation of Public Enterprises by the City of Asheville"); *City of Asheville v. State*, 192 N.C. App. 1, 36-37, 665 S.E.2d 103, 128 (2008) (finding that a local act addressing equitable rates "principally contemplate[d]" and "relate[d] only to matters which are purely economic in nature . . . rather than prioritizing the system's health or sanitary conditions"), *appeal dismissed and disc. rev. denied*, 363 N.C. 123, 672 S.E.2d 685 (2009). The plenary power of the General allows it, not the courts, to craft a resolution of this matter.

As acknowledged in the first clause of Article VII, Section 1, the General Assembly has plenary authority to establish new subdivisions of local government. The General Assembly alone can consider the local competing interests and craft a solution. Such legislative action is not conditioned upon first providing a majority of this Court with satisfactory justification. *Johnson*, 226 N.C. at 8, 36 S.E.2d at 809 ("We have no power to review a statute with respect to its political propriety as long

as it is within the legislative discretion and has a reasonable relation to the end sought to be accomplished."). The majority's holding that a new political subdivision addressing regional problems with the water system violates Article II, Section 24 simply because the legislation involves a water system erases the General Assembly's historic authority to establish convenient local governmental units acknowledged by the first clause of Article VII, Section 1. The General Assembly's creating a new local governmental subdivision does not offend the state constitution. This Court should not weigh the wisdom or expediency of a legislative act. Accordingly, I respectfully dissent.

Chief Justice MARTIN joins in this dissenting opinion.