IN THE SUPREME COURT OF NORTH CAROLINA

No. 89PA22

Filed 23 May 2024

ERIC STEVEN FEARRINGTON, CRAIG D. MALMROSE

v.

CITY OF GREENVILLE, PITT COUNTY BOARD OF EDUCATION

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 282 N.C. App. 218 (2022), dismissing in part, affirming in part, and reversing and remanding in part orders entered on 22 April 2020, 22 July 2020, and 28 July 2020 by Judge Jeffery B. Foster in Superior Court, Pitt County. Heard in the Supreme Court on 21 February 2024.

*Stam Law Firm, PLLC, by R. Daniel Gibson and Paul Stam, for plaintiffs-appellees.*

*Hartzog Law Group, LLP, by Dan M. Hartzog, Jr., Katherine Barber-Jones, and Rachel G. Posey, for defendant-appellant City of Greenville.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Elizabeth L. Troutman, Robert J. King III, Jill R. Wilson, and William A. Robertson, for defendant-appellant Pitt County Board of Education.*

*Michele Delgado, Samuel J. Davis, and Kristi L. Graunke for American Civil Liberties Union of North Carolina Legal Foundation, amicus curiae.*

*Jeanette K. Doran for North Carolina Institute for Constitutional Law, amicus curiae.*

EARLS, Justice.

In 2017, the City of Greenville (Greenville) installed traffic cameras at its most

dangerous intersections. As part of Greenville's Red Light Camera Enforcement Program (RLCEP), those cameras automatically detect and photograph drivers who run red lights. The RLCEP was over a decade in the making. Greenville's first try was in 2004, when it contracted with a company to install and operate red light cameras. *See* City of Greenville, N.C., *Termination of agreement for the Redlight Photo Enforcement Program* 1 (Aug. 9, 2007), http://www.thenewspaper.com/rlc/docs /2007/gvnc-cancel.pdf [hereinafter *2007 Termination Agreement*]. But the City abandoned that effort just three years later after a court decision stymied its ability to fund the program using collected penalties. *See id.* Under that legal regime, Greenville explained, it would be "economically infeasible for [it] to proceed." *Id.* at 2. So it did not.

Almost a decade later, however, Greenville saw a way forward. Inspired by Fayetteville's system of red light cameras, the City asked the legislature for permission to start a "fiscally prudent" program of its own via a cost-sharing agreement with the Pitt County Board of Education (Board). The General Assembly assented. *See* An Act to Make Changes to the Law Governing Red Light Cameras in the City of Greenville, S.L. 2016-64, 2015 N.C. Sess. Laws (Reg. Sess. 2016) 179 (Local Act).

With that legislative blessing, Greenville approved the RLCEP and negotiated an Interlocal Agreement with the Board. The City agreed to forward 100% of collected red light penalties to the Board. It would then invoice the Board for the actual costs

needed to keep the program afloat. All told, the Board kept 72% of the collected funds—about $1.7 million for Pitt County schools. Greenville, in turn, got its long-awaited traffic cameras.

In 2018, plaintiffs Eric Fearrington and Craig Malmrose received citations for red light violations captured by RLCEP cameras. Plaintiffs challenged their citations—first at administrative hearings and then in court. In both forums, plaintiffs argued that the RLCEP violated Article IX, Section 7 of North Carolina's Constitution. That provision—called the Fines and Forfeitures Clause (FFC)—promises the public schools the "clear proceeds" of all penalties, forfeitures, and fines "collected in the several counties for any breach of the penal laws of the State." N.C. Const. art. IX, § 7. In plaintiffs' view, the Interlocal Agreement between the Board and City diverted the "clear proceeds" of red light fines away from Pitt County public schools. The Court of Appeals agreed and struck down the RLCEP's funding mechanism.

On appeal, we consider two questions. First, as residents and taxpayers of Pitt County, do plaintiffs have standing to challenge the RLCEP and seek injunctive and declaratory relief? If so, is the RLCEP—and the statute authorizing it—constitutional under the FFC? We answer yes to both inquiries, and thus affirm in part and reverse in part the Court of Appeals.

## I. Background

### A. Greenville's Red Light Camera Program

Failure to stop at a red light is a civil infraction that carries a maximum $100 penalty. *See* N.C.G.S. § 20-176(a)-(b) (2023). To enforce that provision, the General Assembly has allowed some cities to install red light cameras. *See* N.C.G.S. § 160A-300.1(d) (2023). In 2000, legislators added Greenville to that list. *See* An Act to Authorize the [City of Greenville] to Use Photographic Images as Prima Facie Evidence of a Traffic Violation . . ., S.L. 2007-37, 1999 N.C. Sess. Laws (Reg. Sess. 2000) 149. But though the City had permission to install traffic cameras, that course was not viable under existing law. *See 2007 Termination Agreement*. More specifically, the limits prescribed by N.C.G.S. § 115C-437—and court decisions interpreting that provision—required "90% of the money received from citations be paid to the county school systems." *Id.* at 1. To Greenville, the 10% statutory cap on collection costs made red light cameras "economically infeasible." *Id.* at 2.

But in 2016, the City charted a path towards a "fiscally prudent" red light camera program. Paralleling a similar arrangement in Fayetteville, the Greenville City Council passed a resolution asking the General Assembly for permission "to implement a red light camera enforcement program utilizing an interlocal agreement with the [Board] which includes provisions on cost sharing and reimbursement." The resolution explained that Greenville "has the authority to implement a red light camera enforcement program," but "it is not financially viable unless" coupled with the requested "interlocal agreement with the Board." Without the legislature's approval, Greenville continued, it "could only retain the amount which represents the

cost of collection of the fines which could not exceed 10% of the amount of the fines."
The City thus sought greater fiscal leeway to share costs with the Board. Pitt
County's Board of Commissioners passed a similar resolution.

The General Assembly considered and approved those requests. *See* Local Act.
In 2016, lawmakers statutorily authorized Greenville and the Board to enter an
Interlocal Agreement "necessary and proper to effectuate the purpose and intent of
G.S. 160A-300.1 and this act." *Id.* § 4, at 180. Most importantly—and as requested by
the Board and City—the legislature permitted the Interlocal Agreement to "include
provisions on cost-sharing and reimbursement," so long as Greenville and the Board
"freely and voluntarily agree[d] to" those terms. *Id.*

In response, Greenville amended its code of ordinances to provide for a red
light violation offense. *See* Greenville, N.C., Code § 10-2-283 (2016). Drivers who
received citations could appeal them through an administrative process reviewable
in superior court. *Id.* § 10-2-285. To manage the RLCEP, Greenville hired Officer
Patrick O'Callaghan at a salary of $75,000 per year. It also contracted with American
Traffic Solutions, Inc. (ATS)—a private company headquartered in Arizona—to
install, maintain, and manage the cameras.[1] The City agreed to pay ATS $31.85 of
every $100 citation, on top of other service expenses.

To share the costs of the program and the collected funds, Greenville and the

---

[1] ATS has since become Verra Mobility Corporation. For clarity and consistency with
the Court of Appeals opinion under review, we refer to the corporate entity by its previous
name.

Board entered an Interlocal Agreement. The City agreed to administer the cameras and collect the penalties for red light violations. On the front end, Greenville would forward 100% of the money to the Board. But each month, Greenville would invoice the Board for program expenses, including the "actual cost of the Service Contract" with ATS and Officer O'Callaghan's salary and benefits. The Agreement also contained a backstop: the Board was not required to pay if the costs of the program exceeded the collected fines. In other words, the Board could only make money from the program.

With those agreements in place, Greenville installed red light cameras at five intersections. The cameras are synchronized with the traffic signals. Sensors in the pavement monitor traffic flow just before the stop bar. When a car crosses that bar and enters the intersection during a red light, the sensors send a signal to the camera. The camera automatically snaps two pictures—one of the car at the stop bar, the other as it continues through the intersection. Both photos include the car's license plate and the traffic signal. For good measure, the camera also tapes a video of the violation.

ATS processes the recorded evidence and matches the car's license plate to its registered owner. The company then turns that evidence over to Officer O'Callaghan, who reviews it and decides whether to issue a citation. If he sees a red light violation, ATS mails a civil citation—called a Notice of Violation—to the car's registered owner. The Notice includes pictures of the violation and the car's license plate. It also

instructs the recipient how to view video footage, how and when to pay the $100 civil penalty, and how to request an administrative appeal.

From 2017 to 2019, the RLCEP collected about $2.5 million in red light penalties. Greenville forwarded that money to the Board before invoicing the agreed-upon expenses. The Board, in turn, reimbursed the City a little over $700,000, of which $580,000 went to ATS. In the same two years, the Board kept 72% of the total penalties, netting almost $1.7 million for Pitt County schools. As explained by the Board's Superintendent, the RLCEP "provides additional resources to the [Board] that it would not otherwise have" to "spend exclusively on educational purposes." Those funds, for instance, helped "pay for increased safety measures in schools, including security cameras, warning systems, and modern locks."

## B. Plaintiffs' Suit

On 15 May 2018, Mr. Fearrington received a citation for running a red light. He requested an administrative appeal, arguing that the RLCEP and the Interlocal Agreement violated the FFC because the Board received less than 90% of the collected fines. After a hearing, Mr. Fearrington was found "liable" and notified that he had exhausted his administrative remedies. He then petitioned the Pitt County Superior Court for a writ of certiorari.

In response, the Board and City alerted Mr. Fearrington that "[t]he proper mechanism through which to present your two constitutional challenges to the [RLCEP] is through a declaratory judgment action." The parties drafted—and the

superior court entered—a Consent Order stipulating that Mr. Fearrington "fully exhausted his administrative remedies with the City of Greenville concerning his citation," and that a "declaratory judgment action, rather than a [petition for certiorari], is the most efficient means for [Mr. Fearrington] to present his as-applied challenges" to the RLCEP.

Mr. Malmrose also received and appealed a red-light citation. After an administrative hearing, he too was found "liable."

In April 2019, plaintiffs jointly filed a complaint against the City and the Board arguing that the RLCEP violated various statutes and provisions of North Carolina's Constitution. The complaint specifically targeted the program's funding framework, contending that it breached the FFC by channeling less than 90% of collected penalties to the Board.

The trial court ultimately ruled for the Board and City on all claims. Relevant here, the court granted the Board's and City's motions to dismiss and denied plaintiffs' motion for summary judgment on their FFC challenge. Plaintiffs appealed the trial court's orders on their various claims.

## C. The Court of Appeals Opinion

The Court of Appeals affirmed in part, reversed in part, and remanded with instructions. *See Fearrington v. City of Greenville*, 282 N.C. App. 218, 220 (2022). More specifically, the court reversed the dismissal of plaintiffs' FFC claim and remanded for entry of summary judgment in their favor. *Id.* at 238. The court

otherwise affirmed the trial court's orders. *Id.*

As to jurisdiction, the court concluded that plaintiffs had standing to sue as taxpayers. *Id.* at 226–28. In North Carolina, the court explained, litigants need not demonstrate an injury-in-fact—rather, alleging an infringement of a legal right is enough. *Id.* at 227–28. The court noted too that "there is no serious question that a taxpayer has an equitable right to sue to prevent an illegal disposition of the moneys of a county." *Id.* at 227 (cleaned up). Because plaintiffs were residents and taxpayers of Pitt County, the court reasoned, they had standing to challenge the disbursement of penalties extracted by the RLCEP. *Id.* at 227–28.

On the merits, the court concluded that the funding scheme created by the Interlocal Agreement violated the FFC by allotting to the Board less than 90% of the "clear proceeds" of collected penalties. *See id.* at 235. Under precedent, "clear proceeds" means the total sum collected minus the cost of collection. *Id.* at 235–36. Collection costs, however, do not include the costs of enforcing the law. *Id.* Also relevant, the General Assembly has statutorily defined "clear proceeds" as the net proceeds minus the collection costs, which may not exceed 10% of the total sum collected. *Id.* at 236 (citing N.C.G.S. § 115-437 (2019)).

According to the court, the RLCEP and the Interlocal Agreement violated the FFC by giving the Board just 72% of the total fines. *Id.* That amount fell short of the statutory floor of 90%. *See id.* The arrangement also included impermissible enforcement costs, namely ATS's fees and Officer O'Callaghan's salary and benefits.

*Id.* at 237–38. The court thus awarded summary judgment to plaintiffs on their FFC claim. *Id.* at 238.

The Board and City petitioned this Court for discretionary review. We allowed the petition and now examine the questions raised.

## II. Plaintiffs' Taxpayer Standing

Standing is a "party's right to make a legal claim or seek judicial enforcement of a duty or right." *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 564 (2021) (cleaned up). North Carolina's Constitution opens the courthouse doors to all who suffer injury. *See id.* at 609–10; *see also* N.C. Const. art. I, § 18. Implicit in that principle is the need for parties to have a "personal stake" in the case—an interest that assures the "concrete adverseness which sharpens the presentation of issues." *See Comm. to Elect*, 376 N.C. at 594–95 (quoting *Stanley v. Dep't of Conservation & Dev.*, 284 N.C. 15, 28 (1973)). That is so, we have explained, because a person "directly and adversely affected by the decision may be expected to analyze and bring to the attention of the court all facets of a legal problem." *City of Greensboro v. Wall*, 247 N.C. 516, 520 (1958). In other words, "only one with a genuine grievance" can "be trusted to battle the issue." *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 642 (2008) (quoting *Stanley*, 284 N.C. at 28). And "when specific legal problems are tested by fire in the crucible of actual controversy," the judiciary is better equipped to make "[c]lear and sound" decisions. *Wall*, 247 N.C. at 520.

Under our precedent, an "actual controversy" exists when taxpayers contest an

"illegal and unconstitutional diversion of funds derived from taxes paid by [them] and others similarly situated." *Goldston v. State*, 361 N.C. 26, 34 (2006). For well over a century, then, we have recognized taxpayers' standing to "seek relief when they allege [that] government officials violated statutory and constitutional provisions by diverting tax levies appropriated for one purpose but disbursed for another." *Id.* at 27–28; *see also Stratford v. City of Greensboro* 124 N.C. 110, 127 (1899). In essence, taxpayer standing permits citizen-plaintiffs to bring "a representative class action in equity, brought on behalf of all taxpayers against officials of the government unit challenged." *See* Notes and Comments, *Taxpayers' Suits: A Survey and Summary*, 69 Yale L.J. 895, 906 (1960) (footnote omitted).

The doctrine provides a safety valve from government abuse. As we have explained, "public officers are sometimes derelict in the performance of official duties." *Branch v. Bd. of Educ.*, 233 N.C. 623, 625 (1951). And sometimes, that dereliction involves an "illegal diversion of public funds which may in some degree injuriously affect [a taxpayer's] rights." *Teer v. Jordan*, 232 N.C. 48, 51 (1950). When the "proper authorities have [ ] wrongfully neglected or refused to act, after a proper demand to do so," *Branch*, 233 N.C. at 625, equity allows a taxpayer to "restrain the unlawful use of public funds to his injury," *Teer*, 232 N.C. at 51 (cleaned up). After all, it is not "the manner of the courts of equity to close their doors on allegations of excessive use of power." *McGuinn v. City of High Point*, 219 N.C. 56, 65 (1941). Thus, in proper cases, a taxpayer may sue "on behalf of a public agency or political

subdivision for the protection or recovery of the money or property of the agency or subdivision." *Branch*, 233 N.C. at 625. Without equitable protection, the taxpayers "who bear the burdens of government" would be "without remedy" and "liable to be plundered whenever irresponsible men might get into the control of the government of towns and cities." *Goldston*, 361 N.C. at 31 (quoting *Stratford*, 124 N.C. at 133–34).

That said, taxpayers do not enjoy a freewheeling right to "attack the constitutionality of any and all legislation." *Nicholson v. State Educ. Assistance Auth.*, 275 N.C. 439, 447 (1969). We have set prudential limits on taxpayer suits, recognizing the "disruptive tendency of officious intermeddling by taxpayers in matters committed to the decision of public officers." *Branch*, 233 N.C. at 625. First, a party asserting taxpayer standing must actually pay taxes. *See id.* at 626. In other words, "where a plaintiff undertakes to bring a taxpayer's suit on behalf of a public agency or political subdivision, his complaint must disclose that he is a taxpayer of the agency or subdivision." *Id.*; *see also United Daughters of the Confederacy v. City of Winston-Salem*, 383 N.C. 612, 631 (2022) (denying taxpayer standing because "the amended complaint alleges that plaintiff is a nonprofit (and, therefore, non-taxpaying) corporation" and "does not allege that any of [the organization's] members pay taxes to either the City or the County").

Second, a taxpayer attacking the constitutionality of a legislative or executive act must allege a "direct injury." *Comm. to Elect*, 376 N.C. at 593–94. The complaint

-12-

must show that the challenged expenditure has or will infringe a personal legal interest distinct from the taxpayer's general concern "as a citizen in good government in accordance with the provisions of the Constitution." *Nicholson*, 275 N.C. at 448; *accord Sprunt v. Hewlett*, 208 N.C. 695, 696 (1935) ("Courts never pass upon the constitutionality of statutes, except in cases wherein the party raising the question alleges that he is deprived of some right guaranteed by the Constitution, or some burden is imposed upon him in violation of its protective provisions." (quoting *St. George v. Hardie*, 147 N.C. 88, 97 (1908)). A "direct injury" can include the "deprivation of a constitutionally guaranteed personal right or an invasion of [ ] property rights." *Comm. to Elect*, 376 N.C. at 593 (cleaned up).

In that vein, a taxpayer may challenge the constitutionality of a statute that "imposes on him in its enforcement an additional financial burden." *See Stanley*, 284 N.C. at 29 (cleaned up). We have thus found a direct injury when taxpayers were specifically assessed and "paid motor fuel taxes, title and registration fees, and other highway taxes which by law were collected expressly for application to the Highway Trust Fund but had been diverted for other uses." *Goldston*, 361 N.C. at 29. In another case, by contrast, we held that taxpayers lacked the predicate injury for a constitutional claim because, although they were "taxpayers of the state," they were "not eligible students alleged to have suffered religious discrimination as a result of the admission or educational practices of a nonpublic school participating in the" challenged scholarship program. *Hart v. State*, 368 N.C. 122, 141 (2015); *see also*

*Nicholson*, 275 N.C. at 451 (rejecting constitutional challenge to agency's power to issue bonds because "plaintiff, as taxpayer, can suffer no injury from the issuance of the bonds of which he complains and has no interest therein, except his general interest as a member of the public in good government pursuant to the Constitution"); *Newman v. Watkins*, 208 N.C. 675, 677 (1935).

Third, a taxpayer must allege that "there has been a demand on and a refusal by the proper authorities to institute proceedings for the protection of the interests of the public agency or political subdivision" or that "a demand on such authorities would be useless." *United Daughters,* 383 N.C. at 631 (quoting *Branch*, 233 N.C. at 626). We have borrowed this "demand" requirement from another equitable doctrine: shareholder derivative claims. *See Merrimon v. S. Paving & Constr. Co.*, 142 N.C. 539, 545–49 (1906); *see also Edenton Ice & Cold Storage Co. v. Town of Plymouth*, 192 N.C. 180, 183 (1926). When a government's "property or funds" are "illegally or wrongfully interfered with, or its powers [ ] misused," the government is "ordinarily the proper party to prevent or redress the wrong by appropriate action or suit." *Merrimon*, 142 N.C. at 546. A taxpayer of that government—much like a shareholder—must thus "seek remedial action through the directorate or the other controlling authorities of the corporation itself" before "bringing suit against the corporation to protect its rights or to redress its wrongs." *Murphy v. City of Greensboro*, 190 N.C. 268, 275 (1925).

In other words, taxpayer standing enters the picture "only when and because

-14-

the proper corporate officers will not, for some improper consideration, discharge their duties as they should do." *Merrimon*, 142 N.C. at 550 (cleaned up). As with shareholder derivative claims, the "demand" requirement offers the governing body a chance to fix the problem. *See* Daniel R. Fischel, *The Demand and Standing Requirements in Stockholder Derivative Actions*, 44 U. Chi. L. Rev. 168, 171–72 (1976). This requirement also preserves "the existence and efficient operation of corporate powers and functions." *Merrimon*, 142 N.C. at 547. A contrary rule would inject gamesmanship and trepidation into the machinery of government, allowing "any citizen of his own motion and without notice to the corporate agents [to] enjoin [its] work at any stage of its progress because he did not approve it or the manner in which it was being done." *Id.* at 548. In short, because governments "would find themselves embarrassed at every point of their corporate activity, unless protected by some such restraint upon suits by the citizens," taxpayer standing "requires that a demand be made upon the authorities before the [government] is forced into litigation." *Id.* at 549; *see also United Daughters,* 383 N.C. at 631.

Finally, taxpayer standing is a vehicle to seek injunctive and declaratory relief, not money damages. That is because taxpayer suits are derivative claims "in the nature of a bill of equity." *See Shaw v. City of Asheville*, 269 N.C. 90, 95 (1967) (quoting *Merrimon*, 142 N.C. at 545). If the "proper authorities neglect or refuse to act," taxpayers—much like shareholders—may sue "on behalf of a public agency or political subdivision for the protection or recovery of [its] money or property." *Branch,*

233 N.C. at 625. Within that capacity, a taxpayer may seek to enjoin the government "from transcending [its] lawful powers or violating [its] legal duties in any mode which will injuriously affect the taxpayers." *Shaw,* 269 N.C. at 95 (quoting *Merrimon,* 142 N.C. at 545) So too do "citizens and taxpayers ha[ve] the right to seek equitable relief" if "the governing authorities [a]re preparing to put public property to an unauthorized use." *Id.* (cleaned up). A taxpayer may also request a declaratory judgment. *See Goldston,* 361 N.C. at 34–35.

But taxpayers may not convert an equitable device into a tool for personal gain. For that reason, this Court has never allowed plaintiffs invoking taxpayer standing to obtain damages. We have indeed disclaimed that approach. *See, e.g., Waddill ex rel. Forsyth County v. Masten,* 172 N.C. 582, 585–86 (1916) (endorsing taxpayer suit for "recoveries for money wrongfully disposed of or withheld from the counties" but cautioning that "the funds, if recovered, should be in proper custody and control"). In *Horner,* for instance, we blessed the recovery of "reasonable attorney fees and expenses" by a party who "successfully prosecutes a taxpayers' action and actually recovers for the public treasury moneys otherwise lost." *Horner v. Chamber of Commerce of the City of Burlington, Inc.,* 236 N.C. 96, 101–02 (1952). But we rejected "compensation or allowance of any kind for the time and effort of the suing taxpayer, thus fixing it so the taxpayer may not capitalize on the suit." *Id.* at 101. We now make clear what our precedent has left implicit: Taxpayers have standing to seek *only* "equitable relief and a declaratory judgment when alleging [that] government

-16-

officials violated statutory or constitutional provisions by diverting" public funds "appropriated for one purpose but disbursed for another." *Goldston,* 361 N.C. at 34. Money damages, however, are unavailable to the taxpayer.

It is important to first clarify the nature of plaintiffs' suit. Though plaintiffs style their claim as an "as-applied challenge" to the RLCEP and Interlocal Agreement, they effectively mount a constitutional assault on the Local Act passed by the General Assembly. That is because the Interlocal Agreement—and by extension the RLCEP—were "given legislative efficacy by the statute." *See Boney v. Bd. of Trs.*, 229 N.C. 136, 142 (1948). In practical view, the Local Act brought the RLCEP into being and allowed Greenville and the Board to fund it by sharing costs and reimbursing each other for key expenses. So if the funding mechanism underlying the RLCEP and contained in the Interlocal Agreement violates the FFC, it is because the Local Act that blessed that financing framework exceeded the General Assembly's constitutional authority. *See id.* at 141 (treating a challenge to a school board's conveyance of property to a city as a constitutional attack on the statute authorizing that transfer).

With this dispute in focus, we conclude that plaintiffs have taxpayer standing to raise their constitutional arguments and to seek injunctive and declaratory relief. First, plaintiffs effectively sue on the Board's behalf, arguing that the FFC allots it a larger share of red light penalties than it retains under the Interlocal Agreement. To bolster their claim, plaintiffs allege that they live, vote, and pay property and local

sales taxes in Pitt County. Plaintiffs' complaint thus discloses their status as taxpayers in the "political subdivision" for whom they sue. *Branch*, 233 N.C. at 625; *see also United Daughters,* 383 N.C. at 631.

Plaintiffs also assert a "direct injury" linked to the allegedly unlawful government expenditure. *See Comm. to Elect*, 376 N.C. at 593–94. The RLCEP captured plaintiffs running red lights—Greenville then cited them and they each paid $100. In plaintiffs' view, however, the money extracted by the RLCEP was rerouted from its constitutionally mandated destination: Pitt County's public schools. That diversion was made possible by the statute they now challenge—without the Local Act, the City and Board could not have negotiated the Interlocal Agreement and moved forward with the RLCEP. Because the legislature approved the program's funding framework, plaintiffs allege that they are $100 poorer and county schools are short of their constitutionally earmarked funds. In sum, plaintiffs contend that the Local Act levied an "additional financial burden," *Stanley*, 284 N.C. at 29 (cleaned up), and allowed their money to be "extracted and spent in violation of specific constitutional protections against such abuses of legislative power," *see Flast v. Cohen*, 392 U.S. 83 106 (1968). They have thus alleged the personal and direct injury needed to raise their constitutional claims. *See Comm. to Elect*, 376 N.C. at 593–94.

Plaintiffs meet the demand requirement too. By statute, the Board is tasked with suing and recovering "all money or property which may be due to or should be applied to the support and maintenance of the schools." *See* N.C.G.S. § 115C-44(a)

(2023); *see also Branch*, 233 N.C. at 625. Here, however, the Board worked with the City to craft the very funding scheme assailed as unlawful. And the Board has never challenged the Interlocal Agreement or sought a larger share of collected red light penalties. Just the opposite, in fact.

After Mr. Fearrington's administrative hearing, he sought a writ of certiorari in superior court. His petition argued that the RLCEP funneled less money to the Board than it was constitutionally owed under the FFC. In response, the Board not only declined to pursue that claim, but joined with Greenville to alert him of potential procedural hurdles to his petition. The Board and City underscored their interest in "reach[ing] the merits of this dispute" and "hav[ing] the substantive claims presented to the courts in an efficient manner." To avert procedural obstacles, both defendants suggested a declaratory judgment action as the "proper mechanism" for Mr. Fearrington's challenges. They then proposed and signed a Consent Order stipulating that Mr. Fearrington "fully exhausted his administrative remedies" and that a declaratory judgment action "is the most efficient means for [him] to present his as-applied challenges to the [RLCEP]." The Board and City's correspondence and Consent Order with Mr. Fearrington are the functional equivalent of refusing his request "to institute proceedings for the protection of [the Board's] interests." *See United Daughters,* 383 N.C. at 631 (citing *Branch*, 233 N.C. at 626). In this case, plaintiffs effectively demanded—and the Board effectively declined—to vindicate any claim to a larger share of the red light penalties. The Board's tacit refusal of plaintiffs'

request allowed them to challenge the allegedly unlawful expenditure in its stead.

On relief, though, plaintiffs exceed the compass of taxpayer standing. Their complaint seeks "declaratory relief, injunctive relief, and refunds." Of those remedies, the first two are permissible; the last is not. A "refund" is a repackaged request for damages—in effect, plaintiffs ask the Board to reimburse them and members of a proposed class for red light penalties already paid. As explained above, taxpayer standing is an equitable device for procuring equitable and declaratory relief. As taxpayers, then, plaintiffs may request a declaration on the constitutionality of the RLCEP and Interlocal Agreement, as well as the Local Act authorizing both. So too may they seek to enjoin any unlawful diversion of funds from Pitt County schools. But as taxpayers, plaintiffs may not "capitalize on the suit" and convert a derivative claim into a personal damages action. *See Horner,* 236 N.C. at 101. We thus hold that plaintiffs have taxpayer standing to challenge the "alleged misuse or appropriation of public funds" authorized by the Local Act, and to seek equitable and declaratory relief. *See Goldston*, 361 N.C. at 33–34.

### III.   The Merits of Plaintiffs' Claims

Plaintiffs make two arguments on the merits. They contend that the Interlocal Agreement violates N.C.G.S. § 115C-437 by giving the Board less than 90% of the penalties gleaned by the RLCEP. Plaintiffs also argue that the Interlocal Agreement—and the Local Act authorizing it—run afoul of the FFC by withholding from Pitt County schools the "clear proceeds" of collected penalties. We examine each

claim in turn.

**A. Claim Under N.C.G.S. § 115C-437**

Plaintiffs' first argument is, at bottom, a question of statutory interpretation. Section 115C-437 pledges to "local school administrative unit[s]" the "clear proceeds" they are constitutionally owed. *See* N.C.G.S. § 115C-437 (2023). The provision defines "clear proceeds" as "the full amount of all penalties, forfeitures or fines collected under authority conferred by the State, diminished only by the actual costs of collection, not to exceed ten percent (10%) of the amount collected." *Id.* Put simply, the statute promises county schools at least 90% of collected funds—a government may thus retain only the costs of collection, and only up to 10%. *See id.*

As plaintiffs note, however, the Board and City split funds differently. Under the cost-sharing and reimbursement provisions of the Interlocal Agreement, the Board keeps roughly 72% of red light fines and remits the rest to the City. Because 72% is less than 90%, plaintiffs reason, the Interlocal Agreement flouts the cap set by section 115C-437. This argument turns on the meaning of the Local Act and the legislative purpose animating it. Because section 115C-437 is a statutory limit, the General Assembly can statutorily vary its scope. The question, then, is whether the Local Act intended to exempt the Board and City from the 10% cap and allow them to split costs differently.

When called to interpret a statute, "legislative intent is the guiding star." *Piedmont Canteen Serv., Inc. v. Johnson,* 256 N.C. 155, 161 (1962). We first look to

the plain language, as the "actual words of the legislature are the clearest manifestation of its intent." *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009). If the text is ambiguous, we may also consult "other methods of statutory construction such as the broader statutory context, the structure of the statute, and certain canons of statutory construction to ascertain the legislature's intent." *Wynn v. Frederick*, 385 N.C. 576, 581 (2023) (cleaned up).

In this case, the Local Act does not expressly mandate how the Board and City may allocate costs. The statute permits Greenville to "enter into a contract with a contractor for the lease, lease-purchase, or purchase" of a red light camera system. *See* Local Act § 2, at 180. And it follows that allowance with a broad grant of fiscal authority:

> The City of Greenville and the Pitt County Board of Education may enter into an interlocal agreement necessary and proper to effectuate the purpose and intent of G.S. 160A-300.1 and this act. Any agreement entered into pursuant to this section may include provisions on cost-sharing and reimbursement that the Pitt County Board of Education and the City of Greenville freely and voluntarily agree to for the purpose of effectuating the provisions of G.S. 160A-300.1 and this act.

*Id.* § 4, at 180.

Though the text does not explicitly exempt the Board and City from the 10% cap, other clues make clear the legislature's goal. Most tellingly, there was no reason to pass the Local Act except to vary the existing funding limits. In 2000, the General Assembly authorized Greenville to implement a red light camera program. *See* S.L.

2000-37, § 1. The City had no reason to seek added permission on top of that existing authority. Especially because multiple statutes already allowed Greenville to enter agreements and share costs with the Board. *See* N.C.G.S. §§ 160A-460, -461, -466 (2023). Put simply, neither the City nor the Board needed extra legislative approval for an Interlocal Agreement funding the RLCEP, *unless* that Agreement allowed cost splitting above the 10% cap set by section 115C-437.

When interpreting statutes, we presume that the General Assembly "acted with care and deliberation and with full knowledge of prior and existing law." *Wilder v. Amatex Corp.*, 314 N.C. 550, 562 (1985) (cleaned up). We presume too that the General Assembly does not adopt superfluous legislation. *See State v. Coffey*, 336 N.C. 412, 417 (1994). Those principles in mind, we decline to construe the Local Act as a mere restatement of the Board and City's existing statutory authority. Instead, that provision is best read to exempt the Board and City from the strictures of section 115C-437 and to grant them greater flexibility to share costs and reimburse expenses.

Legislative history confirms that point. For one, Greenville sought the Local Act precisely because section 115C-437 made a red light camera program a pipe dream. As its resolution to the General Assembly made clear, Greenville could not afford to install the cameras if it "could only retain the amount which represents the cost of collection of the fines which could not exceed 10% of the amount of the fines." The legislature understood the City's request for fiscal flexibility. As the bill's sponsor explained when introducing it on the House floor, the measure "allows

-23-

communication between the City of Greenville and a contract to be formed with a red light camera company, proceeds of which[,] after expenses being paid[,] will go to our local school board." *See* H. Deb. on H.B. 1126 (N.C. June 6, 2016) (statement of Rep. Greg Murphy). The sponsor also clarified the fiscal need for the Local Act, explaining that without leeway to apportion costs, the project was not feasible. *See id.* (specifying that Local Act was vital for financial reasons because "the feasibility was not profitable or not—was not at zero sum game for the city itself. Now the city's expenses will be taken care of so they want to put forward with the bill.").

Taken as a whole, statutory context, structure, and history show that the City and Board sought—and the General Assembly approved—a more pliable cost-sharing agreement than allowed by section 115C-437. Because the legislature intended to vary the 10% cap that would otherwise limit the Board and City's funding scheme, this case is not reducible to the simple formula "x > 10%," as the dissent contends. We thus reject plaintiffs' statutory claim and turn to the constitutional merits.

## B. Claim Under the Fines and Forfeitures Clause

In resolving constitutional challenges to a statute, this Court "begin[s] with a presumption that the laws duly enacted by the General Assembly are valid." *Hart*, 368 N.C. at 126. Courts, of course, "have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional—but it must be plainly and clearly the case." *City of Asheville v. State*, 369 N.C. 80, 87 (2016) (cleaned up).

That is especially true in this case because the FFC is not self-executing. *N.C. Sch. Bds. Ass'n v. Moore*, 359 N.C. 474, 512 (2005). We have "long recognized that some constitutional provisions are self-executing while others require legislative action to implement and enforce the[ir] purpose and mandates." *Id.* The FFC falls in the latter category—it is not "complete in itself" and does not offer on its face a discernible "road map of how its mandate is to be" realized. *Id.* (quoting *Kitchin v. Wood*, 154 N.C. 565, 568 (1911)).

The FFC thus requires "legislation to give it effect" and vitalize its aims. *Id.* (quoting *Kitchin*, 154 N.C. at 568). Key too, we have specifically recognized the legislature's authority to clarify "what constitutes 'clear proceeds' of the relevant penalties." *Id.* Because of the FFC's unique status and the legislature's uniquely broad leeway to define its contours, "the General Assembly's actions in specifying how the provision's goals are to be implemented must be held to be constitutional unless the statutory scheme runs counter to the [FFC's] plain language of or the purpose behind" it. *Id.* Applying that rubric, we measure the Local Act and the RLCEP against the FFC's language and purpose.

By its text, the FFC pledges to schools the "clear proceeds" of gathered penalties—in other words, the "net proceeds." *See Cauble v. City of Asheville,* 314 N.C. 598, 604 (1985). To reach that sum, the "reasonable costs of collection constitutionally may be deducted from the gross proceeds." *Id.* But enforcement costs are not deductible. *See id.* at 606. That rule flows from the framer's intent and pragmatic

considerations. *See id.* It would be "impractical and harsh" to "deny municipalities the reasonable costs of collections." *Id.* But without principled limits on deductions, the exception could swallow the rule and the "clear proceeds" promised to public schools could vanish. *See id.* The FFC compels neither extreme. In defining "clear proceeds," then, we struck a bargain: Collection costs are deductible, enforcement costs are not. *See id.* at 605–06.

Our precedent offers general principles distinguishing those spheres. Enforcement deals with governmental acts compelling adherence to the law. It imports an active and direct role in locating, investigating, and prosecuting legal violations. *See Enforcement*, Black's Law Dictionary (11th ed. 2019) ("The act or process of compelling compliance with a law, mandate, command, decree, or agreement"). Enforcement also entails a degree of discretion—an officer compelling obedience to the law exercises independent judgment to detect its violation and decide whether and how to investigate and punish it. *Cf. Isenhour v. Hutto*, 350 N.C. 601, 610 (1999) (citing *State v. Hord*, 264 N.C. 149, 155 (1965)) (noting that a "police officer's authority in enforcing the criminal laws involves the discretionary exercise of some portion of sovereign power").

We have thus linked enforcement expenses to the "general costs of investigation and prosecution of a citizen's unlawful conduct." *Moore*, 359 N.C. at 491. Governments may not retain those sums because the "entire purpose of the [FFC] is to divert fines, penalties, and forfeitures from support of the general operations of

government, including the operating costs of locating and prosecuting those who violate the law." *See* David M. Lawrence, *Fines, Penalties, and Forfeitures: An Historical and Comparative Analysis*, 65 N.C. L. Rev. 49, 67–68 (1986). In calculating the "clear proceeds," then, governmental bodies may not deduct their "normal operating costs" or the "general overhead attributable to prosecution." *Shore v. Edmisten*, 290 N.C. 628, 634 (1976). "Monies for *continued enforcement* are to be provided by the legislature," not siphoned from public schools. *Id.* at 638–39; *see also id.* at 638 (barring government from recovering from criminal defendant "the sum of $500.00 for the use and benefit of the Vice Squad of the High Point Police Department for continued enforcement").

Collection expenses, on the other hand, are the administrative and executory costs of recouping a penalty for unlawful conduct. *See Cauble*, 314 N.C. at 606. Compared to enforcement, collection is more passive and indirect. *See State v. Maultsby*, 139 N.C. 583, 585 (1905) (striking down statute that gave informants whose information led to convictions half of the fine imposed for selling whiskey because that cost was to induce enforcement, not to support collection). Collection also leaves less room for discretion—a person gathering a penalty is given discrete tasks directed towards a discrete goal. Our precedent on collection costs is of a pragmatic strand and recognizes the "economic penalties which might be forced upon the municipalities charged with the collection of fines." *Cauble*, 314 N.C. at 605. We have thus allowed a government to retain a specific sum "over and above its normal

operating costs" and tied to the administrative and programmatic expense of recovering a fine. *See Shore,* 290 N.C. at 634; *see also Moore*, 359 N.C. at 506–07 (permitting "state agencies and licensing boards" to collect payments "for the late renewal of licenses or the late payment of licensing fees" because those are "an administrative charge to cover the costs of collecting the license fees" and "these boards are dependent upon the revenue generated from fees to perform their statutorily mandated services").

Admittedly, the divide between enforcement and collection is not always exact. As this case well illustrates, technology can blur the line between those spheres. We have thus disclaimed a rigid approach, recognizing "the futility of trying to fashion a court-made specific mathematical formula for determining costs of collection." *Cauble*, 314 N.C. at 605. Given the legislature's leeway to define and advance the FFC's mandate, the key inquiry is a deferential one: "permissible deductions must bear a reasonable relation to the costs of collection of the fine." *Id.*

The deductions in this case meet that requirement. Under their cost-sharing agreement, the Board reimburses the City for two main expenses: (1) ATS's fee to install the cameras, maintain them, and process captured red light violations, and (2) the salary and benefits of Officer O'Callaghan, the RLCEP manager who reviews the evidence and approves the citations. In our view, those expenses are more like collection than enforcement and bear a "reasonable relation" to the administrative and procedural expense of recovering red light penalties. *See id.*

That is because installing the cameras, running them, and processing detected violations does not involve the same degree of active, direct, and discretionary functions that typify enforcement. *See id.* at 606. For one, red light cameras capture violations the second they happen—the process is automated rather than discretionary, reflexive rather than contemplated. When a car enters an intersection during a red light, sensors embedded in the pavement detect the movement and "trip" the cameras. Those cameras, in turn, automatically photograph and video the car as it moves through the intersection.

Everything else is downstream of the violation and geared towards collecting the resultant penalty. By its contract with Greenville, ATS has no "discretion to determine the process for addressing red light violations." It instead acts for "the limited purpose of administratively processing recorded images of potential violations." After its cameras capture and its systems screen red light violations, ATS deposits the evidence in a "review queue" for Officer O'Callaghan to examine. His task is limited too—he checks the photos to see that the car was in the intersection when the light was red and that the captured license plate matches DMV records. With his approval, ATS mails a Notice of Violation to the registered owner, who may pay the fine or request an administrative hearing.

It is true, as plaintiffs argue, that "monies to be set aside for *future* enforcement of the law"—including for the "salaries and expenses" of law enforcement officers— "cannot be deducted from fines to arrive at clear proceeds[.]" *Shore*, 290 N.C. at 636

(cleaned up). Here, however, Officer O'Callaghan's role is more administrative and clerical than investigatory or proscriptive. His primary tasks are reviewing evidence of already-captured red light violations and managing the documentation and administrative process of collecting fines. On these facts, the officer's discrete, focused duties are more akin to collection than enforcement, and so his salary and benefits "bear a reasonable relation to the costs" of recouping the assessed penalties. *Cauble*, 314 N.C. at 605. The Board thus retains the "clear proceeds" of fines collected through the RLCEP. *See id.* And by authorizing the Interlocal Agreement and the cost-sharing framework employed by the Board and City, the Local Act does not "run[ ] counter to the plain language" of the FFC. *Moore*, 359 N.C. at 512.

The statute also tracks the FFC's purpose. That constitutional provision advances "two wise ends": "(1) to set apart the property and revenue specified therein for the support of the public school system; and (2) to prevent the diversion of public school property and revenue from their intended use to other purposes." *Boney*, 229 N.C. at 140. In plaintiffs' view, the Local Act clashes with those goals by allowing the Board and City to route funds away from their constitutionally intended destination: Pitt County's public schools.

This Court addressed a similar argument in *Boney*. There, a public school board bought a parcel of land to use "as an athletic field and playground" for children "attending the Kinston Graded Schools." *Id.* at 140. The board hoped to build an athletic stadium on the land but lacked the funds to do so. *See id.* at 137. In response,

the General Assembly passed a statute allowing the board to convey the property to the City of Kinston "in fee simple and without monetary consideration." *Id.* Kinston, in turn, agreed to build a stadium on the land and grant the public schools the "free and unlimited use of the projected stadium and the grounds during the school term." *Id.* at 142. A taxpayer challenged the conveyance and the statute authorizing it, contending—much like plaintiffs do here—that those measures unconstitutionally "permitt[ed] school property to be diverted from its intended use to other objects." *Id.* at 141.

We rebuffed that formalistic claim, explaining that "the supposed diversion of the school property is apparent rather than real." *Id.* True, we acknowledged, the proposed conveyance divested the board "of its legal title to the [ ] property." *Id.* But that arrangement did "not result in any substantial diversion of the land from its intended use for athletic purposes by the children attending the Kinston Graded Schools." *Id.* As the statute stipulated and the written agreement affirmed, Kinston's public schools enjoyed "the free use of the stadium and its site" for athletic and recreational purposes. *Id.* at 142. All told, the board "exchang[ed] a practically unimproved $8,500 tract of land for the right to the substantial use of a $150,000 stadium." *Id.* We declined to elevate form over substance, underscoring that the contemplated conveyance was backed by "valuable consideration"—the public schools, in other words, got the benefit of the bargain. *Id.* In view of that result, we held that the statute authorizing the property transfer "harmonize[d] with the

constitutional provision" and its guiding purposes. *Id.* at 141.

The same is true of the RLCEP. As plaintiffs contend, the Board remits to the City a portion of the collected red light penalties. But the "supposed diversion" of the money "is apparent rather than real," *id.*, for a simple reason: The RLCEP exists only because of the City and Board's cost-sharing agreement and the Local Act blessing it. Without those measures, Greenville could not run the program and the Board would collect no red light penalties whatsoever. Put in practical terms, the question is not whether the Board should receive 72% versus 90% of the funds—it is whether the Board should receive 72% or nothing at all. Here, as in *Boney*, the Interlocal Agreement rests on "valuable consideration," *id.* at 142, and furnishes Pitt County schools with a revenue stream they would otherwise lack. And so here, as in *Boney*, we reject plaintiffs' formalistic position and hold that the Local Act aligns with the FFC's core purposes.

In sum, the Local Act does not "plainly and clearly" violate the FFC by allowing the City and Board to negotiate a reasonable, carefully calibrated cost-sharing agreement. *See City of Asheville,* 369 N.C. at 87 (cleaned up). Pitt County's public schools enjoy the "clear proceeds" of collected red light penalties because the City— and through it, ATS—recoups only the "reasonable costs of collection." *Cauble*, 314 N.C. at 606. Greenville does not profit from the arrangement or use the fines to pad its general operating budget. *Cf. Shavitz v. City of High Point*, 177 N.C. App. 465, 467, 471 (2006) (striking down red light camera program that diverted virtually all

collected penalties to operating costs and general traffic enforcement), *appeal dismissed and disc. rev. denied*, 361 N.C. 430 (2007). Most importantly, the Board and City's narrowly drawn funding arrangement makes the RLCEP possible—without it, the program would not exist and Pitt County schools would lose an important pillar of financial support.

## IV. Conclusion

We affirm the Court of Appeals decision on plaintiffs' taxpayer standing but limit the available remedies to injunctive and declaratory relief, not a "refund." On plaintiffs' FFC challenge, however, we reverse the Court of Appeals. The Interlocal Agreement and the Local Act authorizing it do not countermand the FFC's text or purpose. *See Moore*, 359 N.C. at 512. Because we do not discern a "plain and clear" constitutional violation, *see Hart*, 368 N.C. at 126, we reverse the award of summary judgment to plaintiffs on their FFC claim, and remand this case to the Court of Appeals for further remand to the trial court for entry of summary judgment in favor of Greenville and the Board.

AFFIRMED IN PART; REVERSED IN PART; REMANDED.

Justice DIETZ did not participate in the consideration or decision of this case.

Justice BERGER dissenting.

You often hear lawyers and judges say they went to law school because they hated math. The majority opinion may well prove that point by failing to correctly understand a simple numerical inequality statement. For a discipline that demands certainty, the mathematical formula "x > 10%" now means something quite different. The same can be said for the majority's apparent distaste for definitions. One could read the majority opinion and come away wondering what a law enforcement officer is.

The majority frames the question in this case as follows: "in practical terms, the question is not whether the Board should receive 72% versus 90% of the funds— it is whether the Board should receive 72% or nothing at all." To the contrary, the question is whether the fund-diversion scheme in the Interlocal Agreement comports with the explicit requirements of Article IX, Section 7 and N.C.G.S. § 115C-437.

Our constitution commands that the clear proceeds of fines must be used "*exclusively* for maintaining free public schools," N.C. Const. art. IX, § 7 (emphasis added), and the diversion of funds to pay enforcement expenses here is plainly impermissible. We have defined "clear proceeds" as "the total sum *less only the sheriff's fees for collection*, when the fine and costs are collected in full." *State v. Maultsby*, 139 N.C. 583, 585 (1905) (emphasis added). But costs of collecting the fine

or penalty "do not include the costs associated with enforcing [an] ordinance." *Cauble v. City of Asheville*, 314 N.C. 598, 606 (1985).

In addition, we have held that N.C.G.S. § 115C-437, which imposes a 10% cap on the costs of collection, "implements [A]rticle IX, [S]ection 7 of our state Constitution." *State ex rel. Thornburg v. Currency in the Amount of $52,029.00*, 324 N.C. 276, 285 (1989). Thus, if "x" represents the costs of collection, and x $\leq$ 10%, the financing scheme for collections is allowed by Article IX, Section 7. A funding scheme in which x > 10%, however, is constitutionally and statutorily prohibited, and the majority's assertion that a local bill can override these statutory and constitutional strictures is the legal equivalent of saying $2 + 2 = 5$.

From 2017 to mid-2019, Greenville's Red Light Camera Enforcement Program generated over $2.4 million in revenue from fines. Pursuant to the Interlocal Agreement, however, only about 71.66% of that revenue reached the Pitt County schools. The diversion of funds here effectively reduced the amount of money available for public schools, contrary to the intent and explicit requirements of the Fines and Forfeitures Clause. *See* N.C. Const. art. IX, § 7. In addition, N.C.G.S. § 115C-437 reinforces the constitutional requirement by stipulating that school boards must receive at least 90% of the total fines collected, with only actual costs of collection (capped at 10%) deductible. N.C.G.S. § 115C-437 (2023). The expenses reclaimed by Greenville far exceed this limit.

In addition, the diversion of funds from the schools in the Interlocal Agreement includes enforcement-related costs that are explicitly non-deductible. *See Cauble*, 314 N.C. at 606 ("[C]osts of collection do not include the costs associated with enforcing the ordinance . . . . If . . . the costs of enforcing the penal laws of the State were a part of collection . . . , there could never b[e] any *clear proceeds* of such fines to be used for the support of the public schools.").

Interestingly, the Interlocal Agreement here acknowledges that "[f]or the purposes of determining the clear proceeds derived from the citations" there is a 10% cap on collection expenses like postage, printing, and the costs of computer services. But the agreement goes on to divert $6,250 per month "to pay the salary and benefits of a sworn law enforcement officer." According to the majority, this provision does not pay for a sworn law enforcement officer, even though that officer has responsibility for "final approval of violations." In other words, the individual designated by the Interlocal Agreement as a sworn law enforcement officer, who is responsible for determining if a violation of the law occurred, is not a law "enforcement" officer, even though, as the majority concedes, he "reviews evidence and approves citations."[1]

The majority asks us to ignore the wording of the Interlocal Agreement and the duties performed by Officer Callahan, insisting that this case is a complicated

---

[1] The remaining funds were used to cover the program's expenses, including payments to the out-of-state, for-profit company which administers the camera system.

matter because "technology can blur the line" between collection and enforcement. But it is the redefining of the term law enforcement officer that blurs the line. Officer Callahan may be surprised to learn that the majority believes he is no longer a police officer but merely a "manager" of a government program. I do not share that view.

The Interlocal Agreement as written cannot be squared with Article IX, Section 7, with section 115C-437, with basic math, or common definitions. According to the majority, because the school system receives some benefit, the Interlocal Agreement here is constitutional. We have rejected this idea previously: "if . . . the costs of enforcing the penal laws of the State were a part of collection . . . , there could never b[e] any *clear proceeds* of such fines to be used for the support of the public schools." *Cauble*, 314 N.C. at 606. Because the Fines and Forfeitures Clause has been redefined by the majority here, the question is now about where this Court will draw the line? A 1% benefit? The test appears to be "whether the Board should receive [an amount $\geq$ 1%] or nothing." One shudders to think what we would do if forced to grapple with an algebraic problem.